Stewart EIDELSON, Ernest Webb, and Teamsters Union Local 959, Appellants and Cross-Appellees,

v.

Gary ARCHER, Appellee and Cross-Appellant.

Nos. 5494, 5495.

Supreme Court of Alaska.

May 21, 1982.

Louis R. Veerman, Ely, Guess & Rudd, Joseph W. Evans, and Stanley B. Malos, and Lori S. Kornblum, Law Clerks, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Anchorage, for appellants and cross-appellees.

Lester W. Miller, Anchorage, for appellee and cross-appellant.

## OPINION

Before RABINOWITZ, C. J., BURKE, MATTHEWS, and COMPTON, JJ., and DIMOND, Senior Justice.*

RABINOWITZ, Chief Justice.

Gary Archer, M.D., filed an action against William Ivy, M.D., Stewart Eidelson, M.D., Ernest Webb, and Teamsters Union Local No. 959 (Local 959) following the summary suspension of his medical staff privileges at the Alaska Hospital and Medical Center, Inc. Archer, in part, alleged that defendants had conspired to accomplish his "wrongful removal" from the hospital medical staff, had intentionally interfered with his contractual and professional relationships with the hospital and had defamed him.[1]

Prior to trial Archer amended his complaint, substituting for the three claims for

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska. Alaska R.Admin.P. 23(a)

1. On April 3, 1978, Archer accepted an offer of judgment made by Ivy of $1.00. The remaining defendants Eidelson, Webb and Local 959 proceeded to trial and are appellants before this court.

relief initially pled a single claim for wrongful use of civil proceedings grounded upon Restatement (Second) of Torts § 680 (1976), "Proceedings Before an Administrative Board".[2] The jury returned a verdict in Archer's favor for $150,000 in compensatory damages and $500,000 in punitive damages. The superior court thereafter denied motions for judgment n.o.v. and for a new trial but granted remittitur in the amount of $200,000, thereby reducing the award of punitive damages from $500,000 to $300,000.

Appellants' primary contention in this appeal is that the judgment should be reversed and the suit dismissed because of Archer's failure to exhaust his administrative remedies.[3] We conclude that Archer's failure to exhaust the hospital's internal remedies requires the dismissal of his suit.[4]

*Summary of the Facts*

On August 8, 1977, Dr. Gary Archer, then director of the Critical Care Unit (CCU) at the Alaska Hospital and Medical Center (the hospital), was summoned to a meeting being held in the office of Dr. Stewart Eidelson. Dr. William Ivy, president of the medical staff of the hospital, had asked Dr. Eidelson to arrange this meeting between Ivy, Eidelson, Archer, and hospital administrators Charles Rigden and Ernest Webb.[5] Ivy testified he called this meeting to deal with allegations of misconduct on the part

**2.** Restatement (Second) of Torts § 680 (1976), "Proceedings Before An Administrative Board," states:

One who takes an active part in the initiation, continuation or procurement of civil proceedings against another before an administrative board that has power to take action adversely affecting the legally protected interests of the other, is subject to liability for any special harm caused thereby, if

(a) he acts without probable cause to believe that the charge or claim on which the proceedings are based may be well founded, and primarily for a purpose other than that of securing appropriate action by the board, and

(b) except where they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.

**3.** Appellants presented three arguments on the exhaustion of remedies issue. First, that an action for damages by a physician, challenging the suspension of his hospital privileges, cannot be maintained until the physician has first exhausted the appeal procedures set out in the hospital's bylaws. Second, that having failed to exhaust these administrative remedies Archer cannot now complain that the suspension procedure was improper. Third, that Archer's action for damages was an impermissible attempt to circumvent the normal peer-review procedures. We treat these separate arguments as components of the general exhaustion of remedies doctrine.

**4.** This holding makes it unnecessary to address appellants' other specifications of error. The following is a summary of appellants alternative arguments.

First, appellants assert that the hospital disciplinary procedures were not proceedings before an "administrative board" therefore Archer's claim was improperly based on § 680 of the Restatement (Second) of Torts. *See* n.2

*supra.* Alternatively appellants argue that Archer failed to establish a claim for relief under § 680 because there was no evidence that Webb and Eidelson acted without probable cause or for some improper purpose when they consented to Archer's suspension.

Second, appellants argue that in considering the validity of Archer's suspension the trial court should have applied the "substantial evidence" standard. They claim that the superior court was presented with clear and substantial evidence supporting Archer's suspension, therefore Archer's claim should have been rejected.

Third, they contend there was insufficient evidence of any involvement by Local 959 to support the jury's award of compensatory and punitive damages against the Teamsters union.

Fourth, Webb and Eidelson claim they are immune from liability for Archer's suspension because they acted in good faith within the scope of their authority as agents of the hospital.

Finally, appellants argue there was insufficient evidence that they acted with malice or reckless indifference to Archer's interests to support the jury's award of punitive damages.

Archer cross-appealed on the issue of damages, claiming that the trial court abused its discretion in ordering remittitur of the punitive damages from $500,000 to $300,000. As a result of our decision Archer is no longer entitled to any damages so we need not address the validity of the order of remittitur.

**5.** Dr. Eidelson was a health care consultant to the Alaska Teamster Employers Service Corporation and had worked previously with Dr. Ivy. Ivy testified that he wanted to conduct the meeting in a confidential location and that Eidelson offered the use of his office, located in the Teamsters Mall Building adjacent to the hospital.

of physicians, including Dr. Archer, working in the CCU.

Prior to Archer's arrival, Ivy, Webb, Eidelson and Rigden discussed the problems in the CCU revealed by a committee investigation[6] and a report that Archer had been involved in a dispute with a hospital janitor.[7] According to Archer, when he arrived at the meeting Eidelson asked him to relate his version of the janitor incident and then asked him to wait in the outer office. Several minutes later Archer was called back into the office where Ivy informed him that his hospital privileges were summarily suspended for an indefinite term.[8] Archer testified that when he asked Ivy for an explanation, Ivy stated that it was for past and present disruptions. Ivy testified that his response to Archer was that he would not attempt to delineate all the reasons for the suspension, but that in general it was for past and present disruptions involving patient care.

The following day, August 9, 1977, Ivy sent a letter to Archer formally notifying him of the summary suspension and of his right to a hearing under the hospital bylaws.[9] On August 16, Archer wrote Ivy a letter requesting a hearing on the summary suspension; however, Archer rescinded this request on August 18. Archer stated that he withdrew his request for a hearing upon the advice of Webb and Dr. Sherman Beachman who suggested that it would be better to await Ivy's announcement of the duration of the suspension before deciding whether to request a hearing.

On August 23, at a meeting of the executive committee[10] of the hospital medical staff, Ivy advised the committee members of the suspension and received the commit-

6. There had been allegations that a CCU patient's medical records had been altered in order to conceal the fact that the patient had been given a harmful drug overdose. Dr. Ivy had appointed an ad hoc committee to investigate these charges. In its final report the committee concluded that the patient had probably been administered a drug overdose and that there was definite evidence the patient's medical records had been altered. The committee noted that there was evidence that physicians in the CCU had verbally abused nurses, other employees and patients. There were also allegations that some physicians had consumed alcohol while on hospital premises. The committee concluded that it was unable to make any concrete findings on these charges since it had directed its main investigative efforts towards the overdose incident. Ivy testified that he attributed these problems to Archer, personally and as director of the CCU.

7. On the evening of August 4, 1977, Archer apparently had an argument with a janitor employed at the hospital concerning a locked entrance door through which Archer attempted to enter. A police officer was summoned because the janitor decided to file a complaint. The janitor and his supervisor stated that Archer had shoved the janitor during the argument. Archer denied this charge, and the complaint was later dismissed by the Municipality of Anchorage.

8. Appellants contend that Ivy had independently decided to suspend Archer prior to the meeting and that the purpose of the meeting was to inform Archer and the others of Ivy's decision. Archer contends that the decision to suspend him was made jointly by Ivy, Webb, Eidelson, and Rigden at this meeting. Archer claims that Eidelson was acting as an agent for Jesse Carr, secretary-treasurer of Local 959, and that the suspension was instigated by Carr and Local 959 through their representative Eidelson.

9. The bylaws, adopted and approved by the medical staff and the hospital, set out the conditions and procedures governing the suspension or termination of staff privileges. Article VII § 2(b) provides:

A practitioner whose clinical privileges have been summarily suspended shall be entitled to request that the executive committee of the medical staff hold a hearing on the matter within such reasonable time period thereafter as the executive committee may be convened in accordance with Article VIII of these bylaws.

10. Article XI § 1 provides in part:

a. Composition: The executive committee shall be a standing committee and shall consist of the officers of the medical staff, the chairmen of each clinical department and one member-at-large. The president is chairman of the committee, and the chief executive officer is an ex officio member without vote who shall sit with the committee at all times except when it is in executive session.

At the time of Archer's suspension, the executive committee consisted of Dr. David Dietz, Dr. George Hale, Dr. Thomas Harrison, Dr. William Ivy, Dr. John Lyon, Dr. Gerald Morris, Dr. Burritt Newton, Dr. Jerry Orren, Dr. Donald Rogers, Dr. Tryon Wieland, and hospital administrator Charles Rigden.

tee's support for the actions he had taken concerning Archer. Two days later, August 25, Ivy informed Archer that his suspension would continue until December 1, 1977. Archer claims that he again asked why he was being suspended and that he received no answer. The following day, August 26, Ivy sent written notification of his decision to Archer, stating that the action was being taken in the interest of patient care and advising that Archer had 30 days to request a hearing on his suspension.[11]

On August 29, the hospital executive committee held a special meeting. The members of the committee were issued copies of the investigation into the problems in the CCU, and Ivy informed them of his extension of Archer's suspension. The committee voted to support Ivy and to continue the investigation into the allegations of misconduct.

Archer apparently decided not to request a hearing on his summary supension, and on September 7, 1977, he filed this action in the superior court. On September 30, 1977, Ivy instituted corrective action procedures against Archer via a letter to the executive committee containing 37 allegations of misconduct.[12] Archer's counsel received notice of the investigation and a request to appear

before the committee, but Archer declined to participate.

On December 1, the executive committee voted to permanently suspend Archer's hospital privileges. Written notice was sent to Archer's attorney of Archer's right to request a hearing. Archer did not request a hearing, proceeding instead with the court action he had already filed.

In the superior court appellants then moved for summary judgment on the ground that Archer had failed to exhaust the remedies available under the hospital's bylaws. The superior court denied the motion, ruling that Archer was entitled to a trial to determine the validity of the original summary suspension. Appellants contend the superior court's refusal to apply the exhaustion of remedies requirement and thus grant summary judgment in their favor was erroneous.

### I. Does The Exhaustion of Remedies Doctrine Apply?

■ The threshold question is whether the exhaustion of remedies doctrine is applicable to the internal peer review and disciplinary procedures of a privately owned hospital.[13] Although several

---

**11.** We note that the hospital bylaws do not specify any particular time period for the request of a hearing. Since Archer has not raised any challenge to the adequacy of the 30 day period we conclude that it was reasonable.

**12.** Article VII § 1(a) of the bylaws states:
> Whenever the activities or professional conduct of any practitioner with clinical privileges are considered to be lower than the standards or aims of the medical staff or to be disruptive to the operations of the hospital, corrective action against such practitioner may be requested by any officer of the medical staff, by the chairman (chief) of any clinical department, by the chairman of any standing committee of the medical staff, by the chief executive officer, or by the governing body. All requests for corrective action shall be in writing, shall be made to the executive committee, and shall be supported by reference to the specific activities or conduct which constitute the grounds for the request.

**13.** We note that cases involving the denial or termination of a physician's hospital privileges

have focused on whether the hospital was a public or private institution. The traditional rule is that a private hospital's decisions in this area are not subject to judicial review unless it is charged that the hospital has violated the procedural requirements of its bylaws. *Shulman v. Washington Hosp. Center*, 222 F.Supp. 59, 63 (D.D.C.1963); *West Coast Hosp. Ass'n v. Hoare*, 64 So.2d 293, 297 (Fla.1953); *Silver v. Castle Memorial Hospital*, 53 Haw. 475, 497 P.2d 564, 567 (1972), *cert. denied*, 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 500 (1972); *Burkhart v. Community Medical Center*, 432 S.W.2d 433, 435 (Ky.1968).

In *Storrs v. Lutheran Hosp. and Homes Soc'y*, 609 P.2d 24, 28 (Alaska 1980), we held that a privately operated hospital, which was the only hospital serving the community and which was partially financed and supported by public funds, was a "quasi-public" institution that could not violate due process when suspending a physician's privileges. It is unclear from the record whether the hospital in this case would qualify as a "quasi-public" institution under *Storrs*. A discussion of the public or private nature of the hospital is unnecessary,

courts [14] have applied the exhaustion doctrine to private hospital proceedings, this is a question of first impression in Alaska.

The exhaustion of remedies doctrine is well established in the field of administrative law.[15] A central principle of this doctrine is that a party is not entitled to seek judicial relief for a supposed or threatened injury until the available administrative remedies have been exhausted. *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194, 203 (1969); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 51, 58 S.Ct. 459, 463, 82 L.Ed. 638, 644 (1937). In this case, however, we are not dealing with the actions of an administrative agency. Instead of an action taken by a public governmental body, we are presented with the summary suspension and later termination of a physician's privileges by the medical staff and governing board of a privately operated hospital. To determine whether the exhaustion rule should be applied in this context it is necessary to examine the underlying objectives of the exhaustion doctrine and the nature of the proceedings involved.

In *Van Hyning v. University of Alaska*, 621 P.2d 1354, 1355 (Alaska 1981) we stated:

"The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37 [92 S.Ct. 815, 817] 31 L.Ed.2d 17, 25 (1972).

The reasons underlying the exhaustion doctrine apply equally to cases such as the instant case where a party seeks judicial review of a decision that was not appealed through the administrative process.

*McKart v. United States*, 395 U.S. at 194, 89 S.Ct. at 1662, 23 L.Ed.2d at 203–04. As the Supreme Court stated:

[J]udicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise . . . . A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene. And notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors. Finally, it is possible that frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.

*Id.* at 194–95, 89 S.Ct. at 1662–63, 23 L.Ed.2d at 204.

We must ascertain whether the basic purposes of the exhaustion doctrine are relevant to the peer review decisions and procedures of an association of physicians at a privately operated hospital. When faced with this precise issue, the California Supreme Court concluded:

[T]he policy considerations which support the imposition of a general exhaustion requirement remain compelling in this context. In the first place, even if a plaintiff no longer wishes to be either reinstated or admitted to the organization, an exhaustion of remedies requirement serves the salutary function of eliminating or mitigating damages. If an organization is given the opportunity quickly to determine through the operation of its internal procedures that it has committed error, it may be able to mini-

*Hosp. v. Superior Court*, 17 Cal.3d 465, 131 Cal.Rptr. 90, 551 P.2d 410 (1976); *Garrow v. Elizabeth Gen. Hosp. and Dispensary*, 79 N.J. 549, 401 A.2d 533 (1979).

however, since Archer's suit is based on charges that his suspension was rendered in violation of the procedural requirements of the hospital's by-laws. The hospital's decision is therefore subject to judicial review, even under the traditional test, regardless of the public or private character of the institution.

14. *Shulman v. Washington Hosp. Center*, 348 F.2d 70 (D.C.Cir.1965); *Westlake Community*

15. K. Davis, Administrative Law Treatise §§ 20.01–.10 (1958 & Supp.1965); L. Jaffe, Judicial Control of Administrative Action 424–58 (1965).

mize, and sometimes eliminate, any monetary injury to the plaintiff by immediately reversing its initial decision. . . .

Moreover, by insisting upon exhaustion even in these circumstances, courts accord recognition to the "expertise" of the organization's quasi-judicial tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance. Finally . . . the prior administrative proceeding will still promote judicial efficiency by unearthing the relevant evidence and by providing a record which the court may review.

*Westlake Community Hospital v. Superior Court,* 17 Cal.3d 465, 131 Cal.Rptr. 90, 551 P.2d 410, 416 (Cal.1976). A similar observation was made in *Garrow v. Elizabeth General Hospital and Dispensary,* 79 N.J. 549, 401 A.2d 533, 538 (1979):

> The reasons for the rule relate with like force to hospital proceedings. If the complaining party prevails before the administrative agency or the hospital board, judicial proceedings would have been unnecessary and the court would have intervened needlessly . . . . A hospital board presumably has expertise in certain areas, particularly in determining a physician's qualification in relation to a hospital's facilities, needs and personnel . . . .
>
> Furthermore, it is preferable to decide issues after factual disputes have been resolved by the fact-finding body and not in a vacuum. Often issues will become more limited and sharpened when the facts have been delineated. These results will generally be embodied in the factual findings of the agency or the hospital at the conclusion of the proceedings.

We find *Westlake* and *Garrow* persuasive and conclude that the exhaustion of remedies doctrine is applicable to cases involving the loss by a physician of hospital privileges.

In deciding that the exhaustion rule should apply to Archer's challenge of his summary suspension of his medical staff privileges at the hospital, we balance the interest in allowing the hospital to apply its special competence and expertise, correct its errors, develop a proper record, and discourage deliberate flouting of its processes with Archer's interest in the availability of adequate redress for his grievances. *Montgomery v. Rumsfeld,* 572 F.2d 250, 253 (9th Cir. 1978); *United States v. Newmann,* 478 F.2d 829, 831 (8th Cir. 1973). The hospital's decision to suspend Archer and the subsequent termination proceedings necessarily concerned consideration of his professional competence and his ability to function as part of the hospital's health care system. Courts have recognized that the evaluation of the medical qualifications of physicians is a factual determination properly committed to the expert judgment of the hospital authorities:

> No court should substitute its evaluation of such matters for that of the Hospital Board. . . . The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance.

*Sosa v. Board of Managers,* 437 F.2d 173, 177 (5th Cir. 1971).[16] Given this need for the expert judgment of the medical staff, there is a strong interest in allowing the hospital's peer review process to function without premature interference by the court. At the same time we recognize that Archer's interest in maintaining his staff privileges is an important one which deserves adequate protection. *Storrs v. Lutheran Hospitals and Homes Society,* 609 P.2d 24, 28 (Alaska 1980); *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 366–68 (9th Cir. 1976); *Anton v. San Antonio Community Hospital,* 19 Cal.3d 802, 140 Cal.Rptr. 442, 567 P.2d 1162, 1168 (1977). There is nothing in the nature of this interest, however, which would lead us to conclude that the exhaustion rule is inap-

---

**16.** *See also Klinge v. Lutheran Charities Ass'n of St. Louis,* 523 F.2d 56, 61 (8th Cir. 1975); *Jackson v. Fulton-DeKalb Hosp. Auth.,* 423 F.Supp. 1000, 1003 (N.D.Ga.1976); *Silver v. Castle Memorial Hosp.,* 53 Haw. 475, 497 P.2d 564, 567 (1972) *cert. denied,* 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 500 (1972); *Garrow v. Elizabeth Gen. Hosp. and Dispensary,* 79 N.J. 549, 401 A.2d 533, 538 (1979).

plicable or that immediate judicial intervention was necessary to insure adequate protection.[17] By allowing Archer to bypass the hospital's internal adjudicatory procedures, the superior court, as a practical matter, improperly allowed the jury to substitute its judgment for that of the hospital's peer system.

In reaching this decision, we note that the bylaws, adopted and approved by the medical staff and the hospital, form an integral part of the contractual relationship between the hospital and Archer, a member of the medical staff. *Fahey v. Holy Family Hospital*, 32 Ill.App.3d 537, 336 N.E.2d 309, 314 (1975), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976); *Adler v. Montefiore Hospital Association*, 453 Pa. 60, 311 A.2d 634, 645 (1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). In accepting an appointment to the medical staff, Archer agreed to abide by the provisions of the hospital bylaws.[18]

Articles VII and VIII of the bylaws entitled Archer to request a hearing to contest the suspension of his staff privileges and set out an internal appeal procedure by which Archer could seek review and reconsideration of an adverse decision by the hearing board or the executive committee.[19] The bylaws also provide that a practitioner who fails to request the appropriate hearing or appeal provided in the bylaws shall be deemed to have waived his right to appellate review of the matter.[20] The application of the exhaustion doctrine to Archer's suspension is supported by the general rule that parties to a contract must exhaust the remedies provided by the contract prior to seeking judicial relief. *International Brotherhood of Teamsters, Local 959 v. King*, 572 P.2d 1168, 1172 n.9 (Alaska 1977); *Holderby v. International Union of Operat-*

**17.** In Part II of the opinion, we consider the specific grounds Archer has asserted in support of his claim that the exhaustion requirement should be waived in this case.

**18.** Article III § 3(d) provides:
Every application for staff appointment shall be signed by the applicant and shall contain the applicant's specific acknowledgement of every medical staff member's obligations to provide continuous care and supervision of his patients, to abide by the medical staff bylaws, rules and regulations, to accept committee assignments, to accept consultation assignments, and to participate in staffing the emergency service area and other special care units.

**19.** A physician whose staff privileges have been summarily suspended may request that the executive committee hold a hearing on the matter. Article VII § 2(b). Within 10 days after receipt of a request for a hearing, the executive committee is required to schedule a hearing and provide the practitioner with notice of the hearing and a list of the grounds for the suspension. Article VIII § 3.
The hearing shall be before an ad hoc committee of three or more members of the medical staff appointed by the president of the medical staff in consultation with the executive committee. Article VIII §§ 1(a), 4(a). At this hearing the practitioner is entitled to present evidence and to call and question witnesses in order to contest the charges of misconduct. Article VIII § 5(i). The hearing committee then forwards a written report and recommendation to the executive committee. The report may recommend confirmation, modification or rejection of the suspension order. Article VIII § 5(1).
If the executive committee, after consideration of the hearing committee report, does not terminate the suspension, then the physician is entitled to request appellate review by the governing board of the hospital. Article VIII §§ 1(a), 6(a). The appellate review is conducted by the governing body or by a duly appointed committee of three or more members of the governing body. Article VIII § 6(d). The practitioner must be given access to the record and report of the prior hearing and all other material which was considered by the executive committee. He may submit a written statement, and he may orally present his argument to the appeal board which then has 20 days to issue its decision. If the governing board affirms the summary suspension, it becomes final and not subject to further hearing or review. Article VIII § 7.

**20.** Article VIII § 2(b) provides:
The failure of a practitioner to request a hearing to which he is entitled by these bylaws within the time and in the manner herein provided shall be deemed a waiver of his right to such hearing and to any appellate review to which he might otherwise have been entitled on the matter. The failure of a practitioner to request an appellate review to which he is entitled by these bylaws within the time and in the manner herein provided shall be deemed a waiver of his right to such appellate review on the matter.

*ing Engineers, Local Union No. 12,* 45 Cal.3d 843, 291 P.2d 463, 466 (1955). Our decision is also consistent with the rule that an aggrieved member of a private association must exhaust the remedies provided by the organization before seeking judicial action against the association. *Garrow v. Elizabeth General Hospital and Dispensary,* 79 N.J. 549, 401 A.2d 533, 539 (1979); *Kopke v. Ranney,* 16 Wis.2d 369, 114 N.W.2d 485, 487 (Wis.1962); Annot., 20 A.L.R.2d 532, 564–65 (1951).

In light of the foregoing discussion we hold that the exhaustion doctrine is applicable to Archer's challenge of the suspension and subsequent termination of his hospital privileges.

## II. *Is Archer's Failure To Exhaust The Available Remedies Excused?*

The exhaustion of remedies doctrine, like most judicial doctrines, is subject to exceptions. *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194, 203 (1969); L. Jaffe, Judicial Control of Administrative Action, 432–49 (1965). We now consider the specific grounds Archer has presented in support of his claim that an exception to the exhaustion requirement is justified in this case.

■ Initially, Archer asserts that a physician who is suspended or terminated without proper notice of the charges or a hearing is entitled to institute an immediate action for damages. He cites *Willis v. Santa Ana Community Hospital Association,* 58 Cal.2d 806, 26 Cal.Rptr. 640, 376 P.2d 568, 570 (1962), which held that a physician who is excluded or dismissed, without receiving any notice or hearing, may immediately bring an action for damages. A proper reading of *Willis* does not support Archer's argument that he was entitled to bypass the hospital's review procedures. In reaching this conclusion, we rely on the California Supreme Court's interpretation of *Willis* in *Westlake Community Hospital v. Superior Court,* 17 Cal.3d 465, 131 Cal.Rptr. 90, 551 P.2d 410 (1976), in which the court stated:

In *Willis* ..., we held that a doctor's complaint, containing allegations very similar to the instant complaint, stated a common law cause of action for intentional and unjustifiable interference with the right to pursue a lawful business, calling, trade or occupation. In *Willis,* however, *we did not address the exhaustion of remedies issue discussed herein, for the complaint alleged simply that plaintiff's staff membership had been terminated "without any hearing or assigned reason" ... and there was no indication that any internal remedy was available under the hospital's bylaws.*

*Id.* 131 Cal.Rptr. at 96 n.5, 551 P.2d at 416 n.5 (citations omitted) (emphasis added).

Properly construed, *Willis* stands for the proposition that where no internal remedies are afforded a direct action for damages may be available. *Westlake,* 131 Cal.Rptr. at 96, 551 P.2d at 417. In this case when Archer was summarily suspended, he was notified of his right to a hearing under the bylaws. The day after Archer was advised that his suspension would continue until December, he was given written notice of his right to request a hearing within 30 days. Archer was also notified of the subsequent initiation of termination proceedings by the executive committee, and he was given the opportunity to participate. Unlike *Willis,* Archer did have available remedies, but he declined to exercise them, choosing instead to file an independent law suit. Therefore, we reject Archer's contention that he was entitled to immediately commence an action in superior court for compensatory and punitive damages.

■ Archer next contends his summary suspension was a deliberate misuse of the hospital's disciplinary procedures, per se invalid under the bylaws, and thus excused his failure to exhaust the remedies provided in the bylaws. According to Archer, appellants' decision to summarily suspend him was improper since they lacked probable cause to believe that his immediate suspension was in the best interest of patient care as required under Article VII § 2 of the

bylaws.[21] Archer further asserts that there was no evidence he was a threat to any patient and that the decision to suspend him was motivated by economic concerns. He argues the hospital was experiencing financial difficulties and that the appellants decided to get rid of him in order to increase the usage of the CCU by outside physicians.[22]

Archer relies on the fact that he was originally informed that his suspension was for "past and present disruptions." He points out that while disruptive conduct is a ground for "corrective action" under Article VII § 1 of the bylaws, this section provides that the physician be given notice and a hearing prior to the imposition of any corrective action.[23] He argues that since he was being suspended for "disruptions" he was entitled to notice and a hearing prior to any suspension and that any attempt to summarily suspend him was per se improper, thereby excusing him from any exhaustion of remedies requirement.

We reject, for several reasons, Archer's assertion that the alleged invalidity of the suspension justified his failure to exhaust the remedies provided in the hospital bylaws. Initially, we note Archer's main argument is based on an overly literal interpretation of the bylaws. In essence, Archer's contention is that since disruptive conduct is mentioned in Article VII § 1(a) as a basis for corrective action, it can never serve as a ground for summary suspension under Article VII § 2. A more reasonable reading of the bylaws leads to the conclusion that corrective action under Article VII § 1 is not the exclusive disciplinary remedy for disruptive conduct. The bylaws provide that summary action can be taken whenever immediate action is in the best interest of patient care. It is not difficult to imagine situations in which a physician's disruptive conduct could pose a threat to patient care. Several courts have recognized that a physician's inability or refusal to work cooperatively with other members of the hospital staff may hinder or undermine the effective treatment of patients. *Miller v. Eisenhower Medical Center*, 27 Cal.3d 614, 166 Cal.Rptr. 826, 614 P.2d 258, 267 (1980); *Silver v. Castle Memorial Hospital*, 53 Haw. 475, 497 P.2d 564, 568 (1972), *cert. denied*, 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 500 (1972); *Huffaker v. Bailey*, 273 Or. 273, 540 P.2d 1398, 1400 (1975). Archer's theory that his summary suspension for disruptive

---

21. Article VII § 2 provides:

Any one of the following—the chairman of the executive committee, the president of the medical staff, the chairman of a clinical department, the chief executive officer and the executive committee of either the medical staff or the governing body—shall each have the authority, *whenever action must be taken immediately in the best interest of patient care* in the hospital, to summarily suspend all or any portion of the clinical privileges of a practitioner, and such summary suspension shall become effective immediately upon imposition. (emphasis added).

22. In 1976, the hospital was moved from a five-story 85 bed structure to a new seven-story 200 bed facility. Archer claims underusage of this new facility led to serious financial problems for the hospital. Archer contends outside physicians were discouraged from using the CCU because, as director of the CCU, he demanded that they demonstrate their ability to carry out complicated CCU procedures before he would allow them to admit and treat their patients in the CCU. He asserts that the hospital administration considered him an obstacle to the needed increase in hospital use and used the alleged problems in the CCU and the janitor incident as an excuse to get rid of him.

23. Under Article VII § 1 of the hospital bylaws, a request for corrective action is first presented to the executive committee. Article VII § 1(a). If the corrective action could be a reduction or suspension of clinical privileges, the executive committee then directs the chairman of the department in which the practitioner has privileges, to appoint an ad hoc investigating committee. Article VII, § 1(b).

This investigating committee reports back to the executive committee within 30 days. Article VII § 1(c). If the executive committee decides to recommend a reduction or suspension or revocation of clinical privileges, the affected practitioner is then entitled to an adversary hearing before an ad hoc committee of the medical staff. Article VII § 1(f), VIII § 1(a).

If the recommendation of the executive committee following this hearing is still adverse to the practitioner, he is entitled to an appeal before the governing body of the hospital *before* any disciplinary sanctions are actually imposed. Article VIII § 1(a).

conduct was automatically void under the bylaws must therefore be rejected.

In rejecting Archer's arguments, we are not ruling on the merits of Archer's claim that the hospital's summary action was unjustified. Any challenge or objection which Archer had regarding the propriety of his suspension and later termination should have been raised through the appeal process provided in the bylaws. Whether a physician's alleged misconduct poses a threat to patient care is precisely the type of question to which the exhaustion of remedies doctrine should apply, since the evaluation of the professional competence of doctors requires the specialized expertise of a hospital review panel. *Sosa v. Board of Managers,* 437 F.2d 173 (5th Cir. 1971). Furthermore, if we take Archer's argument to its logical conclusion, the exhaustion of remedies doctrine could be disregarded whenever the hospital's actions are found to be improper. In order to determine whether the doctrine should apply, a court would first have to grant a trial on the merits of the hospital's action, the very result which the exhaustion doctrine seeks to avoid.[24] In reality, this would result in the bypass of the exhaustion requirement once a plaintiff even alleges that the hospital's action was invalid, since if the allegations are later found to be true, the failure to exhaust would be excused.

■ One of the primary purposes of the exhaustion of remedies rule is to promote judicial economy by affording an institution the opportunity to correct its own errors, so as to render judicial action unnecessary. *Van Hyning v. University of Alaska,* 621 P.2d 1354, 1356 (Alaska 1981). If a party could obviate the exhaustion requirement simply by claiming that the hospital's action was improper, the doctrine would effectively be emasculated.

Finally, Archer argues that his failure to pursue the hospital's internal remedies is excused because any appeal he could have taken pursuant to the bylaws would have been futile. Under Article VII of the bylaws, Archer had the right to appeal his summary suspension to the executive committee of the hospital.[25] Archer claims that since the executive committee, in its August 29 meeting, had voted to support the summary suspension action taken by Ivy, he was deprived of any opportunity for an impartial review of the suspension.

The exhaustion requirement has been dispensed with where the administrative remedy is inadequate or where the pursuit of the administrative remedy would be futile due to the certainty of an adverse decision. *Glendale City Employees' Association, Inc. v. City of Glendale,* 15 Cal.3d 328, 124 Cal. Rptr. 513, 540 P.2d 609, 618 (1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Zylstra v. Piva,* 85 Wash.2d 743, 539 P.2d 823, 824 (1975); K. Davis, Administrative Law Treatise § 20.07 (1958). We must therefore assess the adequacy of the hospital's internal procedures.

■ We have previously recognized that the existence of an impartial tribunal is a basic ingredient of a fair and adequate hearing in accordance with due process. *Storrs v. Lutheran Hospital and Homes Society of America, Inc.,* 609 P.2d 24, 28 n.12 (Alaska 1980); *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351, 357 (Alaska 1971). As we have noted[26] it is unclear whether the hospital in this case should be held to the constitutional due process standard. We conclude, however, that where a hospital seeks to assert an exhaustion of remedies defense to a physician's challenge of the suspension of his hospital privileges, our assessment of the adequacy of the internal remedies includes a determination of the availability of an impartial tribunal. In this case, since Archer did not seek an administrative hearing, we are necessarily

---

**24.** The superior court apparently accepted Archer's argument on this point. In denying appellants' motion for summary judgment, the court stated that regardless of Archer's failure to exhaust the hospital's internal remedies Archer was entitled to a jury trial to determine the validity of the original summary suspension.

**25.** Article VII § 2(b), *see* note 9 *supra.*

**26.** *See* note 13 *supra.*

forced to speculate as to what would have happened if Archer had exercised his right of appeal.

■ One potential defect in the hospital's appellate process is that Dr. Ivy, the hospital official who initiated the summary suspension of Archer's privileges, was also a member of the hospital executive committee which would review the suspension decision. We have stated that when the functions of investigating, prosecuting and judging are combined in the same person, the impartial tribunal requirement may not be satisfied. *Storrs v. Lutheran Hospital and Homes Society of America, Inc.*, 609 P.2d 24, 28 n.12 (Alaska 1980); *In re Robson*, 575 P.2d 771, 774 (Alaska 1978). Our review of the record, however, persuades us that in this case Archer has failed to demonstrate that this defect rendered the hospital appeal process inadequate.

While it is true that the executive committee acts as an appellate board of the hospital, the bylaws provide for an adjudicatory hearing conducted by an *ad hoc* committee of physicians, none of whom shall have previously participated in the instigation of the disciplinary action.[27] Under the bylaws then, it was open to Archer to object to the appointment on the hearing panel of any individual who had been actively involved in the suspension decision. If Archer had followed the hospital appeal process, he could have raised any objections he had regarding the alleged impartiality of the hearing panel or the executive committee, including an objection to the participation of Ivy in the executive committee's review of the hearing committee recommendation. Further, our evaluation of Archer's assertions would then have been based on a record of the actual proceedings rather than upon speculation. In addition, at no point before this court did Archer raise any objections to Ivy's potential dual role in the suspension process.

Archer's futility argument also rests on his claim that the executive committee's action at its August 29 meeting amounted to a prejudgment of any appeal Archer might have requested. Archer argues that his failure to exhaust is excused because this "prejudgment" insured that his appeal would be adversely decided by the committee. While Archer was entitled to an appeal before an unbiased tribunal, we reject his assertion that the executive committee's prior involvement in his case made it impossible for the committee to render an impartial decision.

In *Duffield v. Charleston Area Medical Center, Inc.*, 503 F.2d 512 (4th Cir. 1974), the plaintiff's hospital privileges were summarily suspended, pending a subsequent hearing before the hospital review committee. Several members of this committee also served on the hospital governing board which had initially accepted the department of surgery's recommendation that the plaintiff's privileges be withdrawn, subject to the latter's right of appeal before the review committee. Plaintiff claimed this initial decision amounted to a prejudgment of his case and that the respective board members were thereby disqualified from sitting or voting on the review committee. In rejecting plaintiff's claim that his case had been prejudged, the court of appeals stated:

The action taken in this case by the Governing Board on June 29 in receiving and approving conditionally the recommendation of the Department of Surgery against the renewal of the appellant's hospital privileges ... represented simply a step, largely a procedural one at that, in the administrative resolution of the proceedings involving the appellant .... The decision taken was purely tentative and conditional; it became *final only if the appellant voluntarily chose to*

---

**27.** Article VIII § 4(a) of the bylaws provides: When a hearing relates to an adverse recommendation of the executive committee, such hearing shall be conducted by an *ad hoc* hearing committee of not less than three (3) members of the medical staff.... No staff member who has actively participated in the consideration of the adverse recommendation shall be appointed a member of this committee unless it is otherwise impossible to select a representative group due to the size of the medical staff.

*accept the recommendation and not to contest it.*

*Id.* at 518–19 (emphasis in original).

A similar argument was raised in *Robbins v. Ong*, 452 F.Supp. 110 (S.D.Ga.1978), when a physician was notified of the medical staff's decision not to renew his hospital privileges. The plaintiff was informed that a hearing on the matter would be held before the hospital board, at which time he could contest the decision. The hospital board had previously adopted a preliminary recommendation that the plaintiff's hospital privileges be allowed to expire. Plaintiff argued that in taking this initial action the board had prejudged the outcome of the later hearing and had deprived him of an impartial tribunal. The district court rejected this argument stating:

> Due process requires a fair hearing before an impartial tribunal .... However, "consideration on a previous occasion of the plaintiff's qualifications would not demonstrate such bias as to constitute a denial of due process".... Where a medical board has adopted an *ex parte* recommendation, the members are not disqualified from subsequently hearing evidence and ruling on the merits.

*Id.* at 115–16 (citations omitted). The court held that in order to establish that the board was disqualified from deciding an issue there must be evidence of actual bias on the part of the individual members of the board. *Id.* at 116. The fact that the board had previously issued a ruling on the case did not automatically preclude the board from considering the appeal.

We think the instant situation is analogous to these cases. Under the bylaws, Ivy, as president of the hospital staff, was authorized to issue the summary suspension and was not required to consult with or obtain the prior approval of the executive committee.[28] The committee's later approval of Ivy's action was based on Ivy's *ex parte* recommendation and in reality was no more than a decision to allow the Archer case to go forward in accordance with the bylaws. Several executive committee members testified that their support of Ivy's action merely reflected their desire to see the investigation of the CCU problems continue and that they were not prejudging any future appeal. The fact that the executive committee became involved with the case prior to the proposed suspension hearing does not mean that the board was automatically biased. *Withrow v. Larkin*, 421 U.S. 35, 47–49, 95 S.Ct. 1456, 1464–1465, 43 L.Ed.2d 712, 723–25 (1975); *Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 700, 68 S.Ct. 793, 803, 92 L.Ed. 1010, 1034 (1947). Furthermore, the executive committee was not the only available source of relief. Under the bylaws Archer had a separate right of appeal to the governing body of the hospital, the Board of Trustees.[29] He has not demonstrated that his right of appeal to this body was impermissibly tainted by the initial actions of the executive committee.

Under the bylaws, Archer was given an adequate opportunity to appeal his suspension and to present any claims of bias or impartiality. He chose instead to bypass these procedures in order to seek judicial relief. We conclude that Archer has failed to demonstrate that the executive committee was prejudiced against him or that any resort to the appeal process was futile. In short, Archer has failed to establish any adequate justification for his failure to exhaust the hospital's remedies.

For these reasons we hold that the superior court's denial of the appellants' motion for summary judgment was erroneous and must be REVERSED.

CONNOR, J., not participating.

---

**28.** Article VII § 2, *see* note 21 *supra.*

**29.** Article VIII §§ 1(a), 6, *see* note 19 *supra.*