Margaret J. SHARROW and William J. Sharrow, Appellants,

v.

Gary ARCHER, Richard Anschuetz, the Alaska Hospital and Medical Center, Inc., and Teamsters Union Local 959, Appellees.

No. 6135.

Supreme Court of Alaska.

Feb. 4, 1983.

L. Ames Luce, Kelly & Luce, Anchorage, for appellants.

Lester W. Miller, and Robert H. Wagstaff, Wagstaff, Middleton & Pope, Anchorage, for appellee Archer.

Lester W. Miller, and Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellee Anschuetz.

Robert L. Eastaugh, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for appellee Alaska Hosp. and Medical Center, Inc.

Joseph W. Evans, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Anchorage, for appellee Teamsters Union Local 959.

Before RABINOWITZ and COMPTON, JJ., DIMOND, Senior Justice,* CARPENE-

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 11 of the Constitution of Alaska and Alaska R.Admin.P. 23(a).

TI, Superior Court Judge,** and AN-DREWS, District Court Judge.**

## OPINION

DIMOND, Senior Justice.

This is an appeal from a summary judgment entered in favor of Gary Archer, M.D., Richard Anschuetz, M.D., the Alaska Hospital and Medical Center, Inc., and the Teamsters Union Local 959. The superior court ruled that Margaret and William Sharrow were barred from pursuing their claims of medical malpractice and fraud by the statute of limitation. We affirm.

### I.

Margaret Sharrow, who had experience as a registered nurse, entered the Alaska Hospital and Medical Center, Inc. (the hospital) on February 17, 1977, to undergo elective surgery. Three days later, on February 19, she was mistakenly administered a massive overdose of lidocaine by a hospital nurse. Mrs. Sharrow suffered a cardiac arrest, but was resuscitated by the supervising doctors, Gary Archer and Richard Anschuetz.

Following this incident, Archer expressed some doubt as to whether the arrest was drug-induced, and told the nurses they were not to mention the drug overdose either to the patient or in the chart. Hospital records were subsequently altered to delete any mention of the overdose. When the Sharrows confronted Archer with the question of whether an overdose had caused Mrs. Sharrow's cardiac arrest, Archer allegedly responded "no one really knew what had caused [Sharrow's] heart problem." Despite the attempted cover-up, on February 21, 1977, two days after the cardiac arrest had occurred, Dr. Mayer, another hospital physician, advised the Sharrows that Mrs. Sharrow had in fact been administered an overdose of lidocaine which had caused her cardiac arrest.

Mrs. Sharrow stopped seeing Archer after he was suspended from the hospital on August 8, 1977. In November of 1977, she sought the medical advice of Dr. George Rhyneer, an Anchorage cardiologist. Although Mrs. Sharrow had received conflicting reports about her overdose from the hospital, she informed Dr. Rhyneer that she had "ultimately received lidocaine in an overdose, and had a cardiac arrest from that."

In late November and early December 1977, Mrs. Sharrow read various newspaper articles concerning Dr. Archer's suspension from the hospital. Several articles appeared in the Anchorage newspapers, which indicated that Dr. Archer had filed a lawsuit against the hospital claiming that he had been wrongfully discharged by them. The articles further indicated that the hospital claimed Archer had been discharged because of "the manipulation of a patient's medical record to cover-up a serious nursing error" and because Archer had failed "to inform the patient that her cardiac arrest was most probably a result of a medication error rather than a spontaneous event." Another article made specific reference to "the Sharrow case." Despite the publicized controversy, the Sharrows took no legal action against the hospital at that time.

During the spring of 1980, Mrs. Sharrow was called as a witness in the superior court case initiated by Dr. Archer against the hospital administrators.[1] While testifying as to the events occurring during 1977, Mrs. Sharrow was asked whether she had ever considered filing a lawsuit against Archer. Mrs. Sharrow responded as follows:

> Well, after—after the things had been in the paper about Dr. Archer's dismissal from the hospital, and so forth, we did consider it, but from what I learned at

---

** Carpeneti, Superior Court Judge, and Andrews, District Court Judge, sitting by assignment made pursuant to Alaska R.App.P. 106(a).

1. Dr. Archer filed an action in the superior court against William Ivy, M.D., Stewart Eidel-son, M.D., Ernest Webb, and Teamsters Union Local No. 959 following the summary suspension of his medical staff privileges at the hospital. *See Eidelson v. Archer*, 645 P.2d 171 (Alaska 1982).

that time—it seemed like you had to sue for so horrible much, and it was—I didn't want anybody's hide, I wanted just compensation—that didn't seem to be feasible at that time, but as long as he was not on the staff and able to affect anyone else adversely, I felt that was sufficient.

It was not until July 1, 1980, that the Sharrows did file suit. In their complaint they alleged that a drug overdose was negligently given to Mrs. Sharrow in the hospital, that there was a conspiracy or agreement to conceal that fact, and that such conduct was intentional, malicious, fraudulent and negligent.

The appellees filed motions for judgment on the pleadings or summary judgment, on the ground that the Sharrows' action was barred by the two-year statute of limitation. The trial court determined that the Sharrows had full knowledge or should have had full knowledge of the events constituting their claim for relief by the first week of December 1977, and that the statute of limitation began running at that time. Because their complaint was not filed until July 1, 1980, more than two years after the statute began to run, summary judgment was entered against the Sharrows.

## II.

■ On appeal, the Sharrows contend that the court erred in finding that the statute of limitation had run on their claims as a matter of law.[2] The question that must be resolved is at what point the applicable two-year statute of limitation began to run.[3]

A considerable number of appellate cases have addressed the question of whether the statute of limitation should be tolled when

an act of medical negligence has occurred but the injured person does not learn of it until some time later. See Annot., 43 A.L. R.3d 429 (1972). The majority of courts have held that a concealment or nondisclosure of negligence tolls the statute until the injured party has actual notice of the negligence or, in the exercise of ordinary care, should have known of the negligence. See Sartin v. St. Paul Fire & Marine Insurance Co., 359 So.2d 649 (La.Ct.App.1978); Leary v. Rupp, 89 Mich.App. 145, 280 N.W.2d 466 (Mich.Ct.App.1979); Ohler v. Tacoma General Hospital, 92 Wash.2d 507, 598 P.2d 1358 (Wash.1979).

The Sharrows argue that the statute of limitation should be tolled from February 19, 1977, the date of the overdose, until March 1980, when Mrs. Sharrow testified at the trial in Archer v. Eidelson. They contend that their delay in filing suit until July 1, 1980, was justified by their reliance on Dr. Archer's and the hospital's fraudulent concealment of the negligent overdose and that it was not until the Archer trial that they became aware of their potential cause of action.[4]

■ Support for this position in general is readily found in Alaska case law, based on the doctrine of equitable estoppel. As we stated in Chiei v. Stern, 561 P.2d 1216, 1217 (Alaska 1977), "a party who fraudulently conceals from a plaintiff the existence of a cause of action may be estopped to plead the statute of limitation if the plaintiff's delay in bringing suit was occasioned by reliance on the false or fraudulent representation." See also Groseth v. Ness, 421 P.2d 624 (Alaska 1966); Alaska Airlines, Inc. v. Lockheed Aircraft Corp., 430 F.Supp. 134, 138 (D.Alaska 1977). The question to be determined is whether the Sharrows' reliance on Dr. Archer's statements was

---

2. Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c). Straight v. Hill, 622 P.2d 425, 426 (Alaska 1981).

3. The statute of limitation for negligence and fraud is governed by AS 09.10.070, which provides in relevant part, "No person may bring an

action (1) . . . for any injury to the person or rights of another not arising on contract . . . unless commenced within two years."

4. The Sharrows contend that it was only during this trial that they learned of the "sworn testimony" of the nurse who gave the overdose, that she had in fact given it, and that the records had been altered to conceal this.

justified under the circumstances, and at what point in time, if any, such reliance became unreasonable.

## III.

■ We conclude that the Sharrows had or should have had sufficient knowledge of the events in question as of December 1977 to realize they had a potential cause of action for negligence and fraud. Any reliance upon statements of Dr. Archer after that time was unreasonable. Although the specific details of the malpractice and fraudulent cover-up may not have been revealed to the Sharrows until the trial of *Archer v. Eidelson,* the undisputed facts show that the Sharrows were or should have been aware of the facts supporting their claim for relief well before that time. *Van Horn Lodge, Inc. v. White,* 627 P.2d 641, 644 (Alaska 1981); *Brueck v. Krings,* 230 Kan. 466, 638 P.2d 904 (Kan.1982).

Although the Sharrows were informed of the overdose by Dr. Mayer only two days after it occurred, the superior court recognized that due to the nature of the physician-patient relationship, the Sharrows could still have justifiably relied on the statements of Dr. Archer at that point. *See Adams v. Ison,* 249 S.W.2d 791, 793–94 (Ky.Ct.App.1952). The superior court therefore ruled that the statute of limitation was tolled from February 19, 1977, until December 1977. The court determined that by that time any reliance by the Sharrows upon the statements of Dr. Archer was clearly unreasonable.

By December 1977, Mrs. Sharrow had been informed of her overdose by Dr. Mayer and had specifically stated to Dr. Rhyneer that she had been given an overdose.

Once she knew that the overdose was the cause of her cardiac arrest, Mrs. Sharrow should have realized that the only way to reconcile the conflicting accounts of her treatment and its relationship to the cardiac arrest was that Dr. Archer and the hospital had concealed the true facts. Moreover, Mrs. Sharrow herself testified that on or about August 1977 she and her husband decided to forego any legal action against the defendants, not because they believed any statement of Dr. Archer that no negligence had occurred, but because they felt that the dismissal of Dr. Archer from his position at the hospital was enough because he would no longer be able to affect others adversely.

In addition, Mrs. Sharrow knew that she was the "Sharrow case" alluded to in newspaper articles regarding Dr. Archer, as well as of his dismissal from the hospital and the surrounding litigation. She also knew that the records that allegedly had been tampered with were hers. This information was sufficient to alert a reasonable person that he or she had a potential cause of action against Dr. Archer and the hospital for negligence and fraud.

The fact that the Sharrows had not been informed of the "wrong" by the "wrongdoer" or were not convinced that there was "proof" of the wrong or aware of "sworn testimony and documentary evidence" substantiating it does not establish that a reasonable person would be unaware of the wrong or the wrongdoing.[5]

## IV.

■ In conclusion, we find that no genuine issue of material fact has been raised that would preclude summary judgment.[6]

---

**5.** In *Tobacco & Allied Stocks, Inc. v. Transamerica Corp.,* 244 F.2d 902 (3d Cir.1957), the court rejected a claim by plaintiffs that laches should not attach until the district court in a prior case had issued its opinion finding fraud: "To have such knowledge of fraud as will begin the operation of laches, however, a legal adjudication of the question of fraud is hardly necessary. It is sufficient if facts come to plaintiff's attention that would warrant the inferences which reasonable men would draw, and that

would put reasonable men on inquiry to protect their rights." *Id.* at 904.

**6.** The affidavits submitted by the Sharrows in opposition to the motion for summary judgment do not directly address the admissions Mrs. Sharrow made while being examined in the case of *Archer v. Eidelson.* They do not assert that the Sharrows were unaware of the overdose after December 1977 or that they had no reason to believe that the hospital records had been manipulated. In any case, because

Although reasonable persons might have differed as to whether Mrs. Sharrow actually understood that the facts she knew gave rise to a cause of action, there could be no difference of opinion that she *should have known* that she had a cause of action by December 1977. The two-year statute of limitation for negligence and fraud therefore expired in December 1979, nine months before the Sharrows filed their action.

The judgment of the superior court is AFFIRMED.

RABINOWITZ, Justice, dissenting.

I dissent from the court's holding that no genuine issue of material fact has been raised that would preclude summary judgment. More particularly, I disagree with the majority's holding that on this record " . . . the Sharrows had or should have had sufficient knowledge of the events in question as of December 1977 to realize they had a potential cause of action for negligence and fraud. Any reliance upon statements of Dr. Archer after that time was unreasonable."

Civil Rule 56(c) provides in part that summary judgment " . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." Case law establishes that in a ruling upon motions for summary judgment inferences of fact from the materials presented are drawn in favor of the party opposing the motion for

summary judgment and against the movant. *Clabaugh v. Bottcher,* 545 P.2d 172, 175 n. 5 (Alaska 1976); *Alaska Rent-A-Car, Inc. v. Ford Motor Co.,* 526 P.2d 1136, 1139 (Alaska 1974); *Nizinski v. G.V.E.A.,* 509 P.2d 280, 283 (Alaska 1973).

The court holds that concealment or nondisclosure of medical negligence tolls the statute of limitations "until the injured party has actual notice of the negligence or, in the exercise of ordinary care, should have known of the negligence."[1]

Drawing inferences from the facts in this record in favor of the Sharrows and against Dr. Archer, I think that the question of the reasonableness of the Sharrows' reliance after December 1977 on the statements of Dr. Archer, as well as the hospital records, is one that should be submitted to a jury for resolution. In my view, all of the critical facts relied upon in the court's opinion are subject to differing interpretations. For instance, Margaret Sharrow averred, in part, "[t]hat it was not until the recent trial in the case of *Gary Archer v. Steward Eidelson,* et al., 77–6264, that I became aware of sworn testimony and documentary evidence which established the facts set out in plaintiff's complaint." Additionally, Margaret Sharrow stated in her affidavit:

That after the events previously described in this affidavit, I was convinced that there was no "proof" that I had received an overdose. In addition, my treating physician during the period of the alleged overdose, Dr. Archer, had continuously led me to believe my "heart attack" had been the result of a pre-exist-

the standard for determining when the statute of limitation begins to run is an objective one, dependent on when a person knows or should have known of the facts giving rise to the cause of action, the subjective allegations of the Sharrows do not raise genuine issues of fact.

1. In *Greater Area, Inc. v. Bookman,* Alaska, 657 P.2d 828, 829 (1982), a case involving alleged attorney malpractice, this court adopt-

ed the "discovery rule" for determining when the applicable statute of limitations commences. We specifically stated that:

According to the best formulation of that rule, the statute of limitations for legal malpractice does not begin to run until the client discovers, or reasonably should discover, the existence of all the elements of his cause of action. [footnote omitted]

ing condition and never disclosed the true facts of the overdose and cover-up.[2]

It is clear from this record that Mrs. Sharrow was unaware that her medical records had been tampered with, and that she placed considerable reliance upon these falsified records in determining whether or not she had grounds to institute suit against Dr. Archer. The record does show that Mrs. Sharrow undertook an extensive examination of her own hospital file and also took these same falsified records to California in December of 1977 to be reviewed by her niece, a registered nurse in a critical care unit.

In short, I cannot join in the majority's conclusion that once Mrs. Sharrow "knew that the overdose was the cause of her cardiac arrest, Mrs. Sharrow should have realized that the only way to reconcile the conflicting accounts of her treatment and its relationship to the cardiac arrest was that Dr. Archer and the hospital had concealed the true facts." Given that this issue arose in the context of a motion for summary judgment, it is my view that the record demonstrates the existence of genuine issues of material fact which should have been submitted to a jury for determination. Thus, I would reverse and remand for further proceedings, including the determination of when Mrs. Sharrow had either actual knowledge, or should have

known that she had a claim for relief against Dr. Archer.

2. The court also states that in November 1977 Mrs. Sharrow "informed" Dr. Rhyneer that she had received an overdose of lidocaine, and that her cardiac arrest had resulted from the overdose. The record is ambiguous with respect to what conclusions he reached based upon information he had received before Mrs. Sharrow's visit, from other sources. At one point, the doctor stated that, when Mrs. Sharrow told him she'd had a cardiac arrest, "I recognized a story that I'd heard." Dr. Rhyneer went on to explain that he was "advised to the circumstances of her cardiac arrest." He never stated that Mrs. Sharrow herself told him about these circumstances. In fact, his recollection was hazy concerning Mrs. Sharrow's command of the history of her overdose:

> I don't recall that she told me exactly how much Lidocaine that she received, but my understanding was that she thought she had received an excessive amount of it.

Additionally, the court states that Mrs. Sharrow "read various newspaper articles" appearing in November and December of 1977 concerning Dr. Archer's misconduct in the " 'Sharrow case' ". There is no specific support in the record for the fact that she actually read these articles, or which she did read and which she did not. Further, of the two articles in the record before the court, only one mentions the "Sharrow case" by name, and provides no information at all concerning what that case involved. The other article does indicate that a patient went into cardiac arrest due to a "medication error" of some sort, but does not identify the patient or the nature of the error. A jury might reasonably find, even if it concluded that Mrs. Sharrow had seen the articles in question, that they did not advance her attempt to reconstruct the circumstances of her cardiac arrest.