*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| NICHOLAS A. GEFRE and CHARLES T. BECK, individually and as a derivative action on behalf of PETRO ALASKA, INC., an Alaskan corporation,<br><br>         Appellants,<br><br>    v.<br><br>DAVIS WRIGHT TREMAINE, LLP; JON S. DAWSON; RICHARD A. KLOBUCHER; BURR PEASE & KURTZ; and JOHN C. SIEMERS,<br><br>         Appellees.<br><br>BURR PEASE & KURTZ and JOHN C. SIEMERS,<br><br>         Cross-Appellants,<br><br>    v.<br><br>NICHOLAS A. GEFRE and CHARLES T. BECK, individually and as a derivative action on behalf of PETRO ALASKA, INC., an Alaskan corporation,<br><br>         Cross-Appellees. | Supreme Court Nos. S-13675/13745<br><br>Superior Court No. 1KE-07-00370 CI<br><br>O P I N I O N<br><br>No. 6804 - August 2, 2013 |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, Trevor Stephens, Judge.

Appearances: Daniel W. Hickey and Anne M. Preston, Gruenstein & Hickey, Anchorage, and James J. Ragen and Gail M. Ragen, Ragen & Ragen, Seattle, Washington, for Appellants and Cross-Appellees. Patrick B. Gilmore, Atkinson, Conway & Gagnon, Anchorage, for Appellees Davis Wright Tremaine, LLP, Jon S. Dawson, and Richard A. Klobucher. Clay A. Young and Kendra E. Bowman, Delaney Wiles, Inc., Anchorage, for Appellees and Cross-Appellants Burr Pease & Kurtz and John C. Siemers.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices. [Christen, Justice, not participating.]

WINFREE, Justice.

## I. INTRODUCTION

Shareholders of a closely held corporation brought a derivative suit against a shareholder-director and the corporation's former attorneys for fiduciary fraud, fraudulent conveyance, legal malpractice, and civil conspiracy. After an evidentiary hearing, the superior court ruled all the claims were time-barred. We affirm the superior court's dismissal of most claims, but reverse its dismissal of two claims and remand those claims for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Gefre, Beck, and Steffen form Island Fuel (Petro Alaska).

Nicholas Gefre, Charles Beck, and Edward Steffen, who were friends and co-workers, formed Island Fuel, Inc. (Petro Alaska) in 1985. Steffen took 52% of the corporation's stock; Gefre and Beck took 24% each. Each became a member of the Board of Directors. The Board appointed Steffen President, Gefre Vice-President, and

Beck Secretary and Treasurer. None had prior corporate experience, and despite his title as Secretary, Beck did not maintain the corporate books or minutes. Steffen acted as the company manager and Gefre and Beck worked in the company's day-to-day operations.

Petro Alaska was successful and there was agreement to expand operations. In January 1988 Steffen and his wife leased a Ketchikan property (the Property) from Stephen and Cheryl Day.[1] Steffen executed the lease in his name, although the lease referenced him as an individual doing business as Petro Alaska; the lease also indicated that Petro Alaska would make improvements on the Property. The Board met in December 1988 and ratified the lease and authorized Steffen to pursue, on Petro Alaska's behalf, a lease with an option to purchase the Property.

## 2. Steffen retains Davis Wright Tremaine.

In December 1988 Steffen contacted the law firm Davis Wright Tremaine (DWT) to represent Petro Alaska. The initial engagement letter from DWT partner Richard Klobucher stated DWT would provide Petro Alaska general corporate representation and "eventually [represent] all of the shareholders in personal estate and estate tax planning matters." The corporate representation specifically included a review of current corporate affairs. DWT then prepared the December 1988 Board meeting minutes, which reflected that the Property was a corporate opportunity Steffen was pursuing on Petro Alaska's behalf. DWT soon began estate planning for Steffen, but had no direct contact with Gefre or Beck.

DWT partner Judith Nevins helped Steffen pursue a lease of the Property

---

[1] Both Steffen's and his wife's names were on the Property lease and later on the Property's title when it was purchased. Both were also named as defendants in this suit. But for ease of reference we use "Steffen" to refer both to Steffen individually when discussing his actions and to the Steffens collectively when discussing the Property ownership.

with an option to purchase. Nevins understood DWT represented Petro Alaska, and advised Steffen that the lease should be in Petro Alaska's name. Steffen initially agreed, but later told Nevins that the Days wanted the lease made in Steffen's name. Believing it was an accommodation to the Days, Nevins drafted a letter to the Days' attorney stating Steffen, rather than Petro Alaska, would be the lessee. Nevins did not communicate this change to Gefre or Beck because she believed Steffen would do so.

Nevins finalized the lease in January 1990. The lease granted Steffen an option to purchase the Property, with a rebate on the purchase price equivalent to rent paid. It did not memorialize Nevins's understanding that Steffen held the Property for Petro Alaska's benefit; instead, it provided that the Property could be subleased by Steffen to Petro Alaska only if Steffen maintained at least 52% ownership of Petro Alaska. DWT billed Petro Alaska for its lease-related legal fees.

Steffen informed Gefre and Petro Alaska's bookkeeper that he had negotiated a five-year lease for the company with a purchase option. He did not disclose that the lease was in his name. The Board did not formally adopt or ratify the lease at Petro Alaska's December 1991 Board meeting, which was its last official meeting prior to this litigation. Petro Alaska paid the lease rent, and its financial statements for 1990 through 1992 indicated that Petro Alaska leased and had an option to purchase the Property.

### 3. Steffen exercises the purchase option.

Steffen exercised the purchase option in December 1993 and took title to the Property. He received credit against the purchase price for Petro Alaska's lease payments. Petro Alaska's 1993 financial statement stated: "Effective January 1, 1994, the company's majority stockholder acquired the property on which its Ketchikan, Alaska operations are located. Effective January 1, 1994 the company leased this property from the majority stockholder." Petro Alaska's financial statements from 1994

to 2006 included the lease payments to Steffen. Petro Alaska's bookkeeper was aware that Steffen had purchased the Property and was leasing it to Petro Alaska. Gefre and Beck were not told.

DWT prepared consent minutes in lieu of Board meetings for 1992 through 1994. The 1993 consent indicated Petro Alaska had purchased the Property for $750,000. The 1994 consent contained a provision on the first page approving the lease between Steffen and Petro Alaska. Gefre and Beck signed the second page, but later denied seeing or approving the provision ratifying the lease between Steffen and Petro Alaska.

Gefre discovered by early 1995 that Steffen owned the Property. He confronted Steffen, who claimed he purchased it for Petro Alaska because the Days did not want to sell to a corporation. Steffen assured Gefre that he held the Property for Petro Alaska and would transfer title. Steffen repeatedly promised Gefre that he would transfer the title, but did not.

### 4. Gefre retains attorney Clay Keene.

Gefre retained Ketchikan attorney Clay Keene in 1997 to help secure title to the Property for Petro Alaska. Keene advised Gefre that he had fiduciary duties as a Board member and could be personally liable to Petro Alaska for not fulfilling those duties. Specifically, Keene informed Gefre that his fiduciary duties included ensuring Petro Alaska received title to the Property.

In November 1997 Keene ghostwrote a letter to Steffen for Gefre and Beck. In this letter Gefre and Beck acknowledged Petro Alaska had not maintained required corporate formalities, including Board meetings, and stated a desire to begin doing so. They also acknowledged Steffen held title to the Property as an accommodation to Petro Alaska, and asked Steffen to transfer the Property to Petro Alaska by the end of 1997. They requested that Gefre, Beck, and Steffen meet with Petro Alaska's outside

accountant, Peter Hogan, to discuss tax consequences of transferring the Property to Petro Alaska.

Gefre, Beck, and Steffen met with Hogan in November 1997. They agreed Steffen would transfer title to Petro Alaska and the shareholders as individuals. Steffen stated he would work with Hogan to transfer the title, and Hogan memorialized the meeting. Neither Gefre nor Beck contacted Hogan to verify whether title had been transferred. Nothing changed with respect to how Petro Alaska's directors conducted corporate affairs. In 1998 Steffen contacted DWT about establishing a limited liability company into which he could transfer his real estate holdings, including the Property. Petro Alaska was billed for at least some of this work.

### 5. Beck requests a buyout, and Steffen destroys records.

Beck's health deteriorated in the late 1990s and he left Alaska for medical treatment. He asked for a buyout of his Petro Alaska shares in 2000, but this did not occur. Petro Alaska continued to pay Beck's wages and health insurance for a time, but these payments eventually were discontinued.

In 2000 Beck contacted Connie Williams, Petro Alaska's bookkeeper from 1986 to 1997, regarding possible corporate wrongdoing by Steffen. She provided Beck a list of suspected improprieties, including appropriating corporate money to acquire personal property, funding personal real estate ventures with corporate funds, and personally purchasing the Property with Petro Alaska making the loan payments coded as "rent." Beck believed Williams, but did not show the list to Gefre or Hogan. Near the same time, a Petro Alaska employee informed Beck that Steffen was destroying corporate records.

In the early 2000s Gefre became aware that Steffen had directed Petro Alaska staff not to send Gefre financial statements. Gefre nonetheless knew he had a right to review corporate records. Both Beck and Gefre repeatedly requested corporate

records from Steffen, but he ignored or put off their requests. Beck concluded before June 2002 that Steffen would not transfer the Property's title to Petro Alaska.

### 6.    Beck retains attorney Clay Keene and considers suit.

Beck retained Keene in May 2002 regarding Steffen's self-dealing and the Property. He told Keene about Williams's information on Steffen's self-dealing. He also gave Keene copies of corporate records he had received from Gefre. In June 2002 Keene ghostwrote a letter for Beck to send to Steffen. In this letter Beck requested copies of 30 categories of corporate records, including Property-related records, and requested that all corporate documents be preserved. Beck also informed Steffen that his failing health required him to liquidate his Petro Alaska shares and offered to sell them for $500,000. A copy of the letter was sent to Gefre.

In July 2002 Beck received a reply from Petro Alaska, including documents enabling Beck to resign as a director and officer. In a response ghostwritten by Keene, Beck declined to resign until his concerns about the company were resolved. He also requested copies of all corporate minutes and bylaws.

Keene ghostwrote another letter for Beck in late July 2002. This letter to Steffen reiterated Beck's demands for corporate records, including records related to the Property, stated his intent to remain a director, and expressed his concern with Steffen's record-request obstruction. Beck copied Gefre and a Petro Alaska employee, asking the employee to send him copies of certain records.

Steffen referred Beck's letters to attorney Jonathan Michaels at DWT. Michaels did not know former DWT partner Nevins, who had left DWT before he joined the law firm, and had had no prior contact with Petro Alaska. Michaels drafted a response to Beck's second letter for Steffen, which Steffen modified. Steffen's response included certain corporate records and stated that: (1) he purchased the Property and leased it to Petro Alaska; (2) the other requested records could be reviewed at Petro

Alaska's offices; (3) neither Petro Alaska nor its shareholders were able to purchase Beck's shares; and (4) Petro Alaska requested Beck's resignation because he had not actively participated in managing Petro Alaska.

In August 2002 Beck contacted Keene to express concerns about incomplete corporate minutes. He also stated his fear that Steffen might attempt to bankrupt Petro Alaska and leave. Keene ghostwrote another letter for Beck to send to Steffen, reiterating Beck's demands for corporate records, stating Steffen's purchase of the Property was a misappropriation of Petro Alaska's corporate opportunity, and stating Beck could not be removed as a director or officer. Gefre was sent a copy.

At this time Beck began considering legal action against Steffen. He again contacted former bookkeeper Williams and asked for information on Steffen's self-dealing. She responded with information about several instances of Steffen's self-dealing and offered further assistance. Beck never followed up with Williams.

Beck consulted further with Keene, who advised him that although he could be removed as a director, Beck retained access to the Board's records as a shareholder. In August Beck had Keene ghostwrite more letters to Steffen, containing demands and statements similar to Beck's previous letters. Keene advised Beck that a suit against Steffen was possible, but suggested that contacting the Alaska Department of Labor (DOL) to file a complaint might yield the same results as litigation. He also noted that if Beck personally pursued an action against Steffen, Steffen could avail himself of Petro Alaska's assets to defend himself at the company's expense. In September 2002 Beck contacted DOL about investigating Steffen. He emphasized that Steffen had "essentially stol[en]" the Property from Petro Alaska, but DOL declined to investigate.

DWT referred Beck's August 2002 inquiries to the law firm Burr Pease & Kurtz (BPK). In October John Siemers of BPK ghostwrote a letter for Steffen to send to Beck stating that Steffen owned the Property, Petro Alaska owned the improvements

on the Property, and the purchase was reflected in Petro Alaska's records. The letter also stated that Petro Alaska would consider replacing Beck at its next Board meeting.

In November 2002 Keene ghostwrote two more letters for Beck to send to Steffen, asserting Steffen had breached his fiduciary duties to Petro Alaska by engaging in self-dealing. Siemers ghostwrote Steffen's response to these two letters, describing Beck's allegations as "reckless" and lacking a basis in fact. The letter also advised Beck to retain an attorney if Beck believed he had "a claim against the company." The letter stated Petro Alaska was "prepared to defend itself in a court of law, if necessary." BPK did no further legal work for Petro Alaska after 2002. It closed its file on Petro Alaska in 2004 and destroyed its Petro Alaska records in August 2005.

In November 2002 Steffen formed Steffen Properties, LLC (the LLC) with DWT's help. He then transferred the Property to the LLC.

Because he was indicted on an unrelated criminal matter and because Keene would not accept the case on a contingent fee basis, Beck did not bring suit in 2002 or 2003. Afraid of "rock[ing] the boat," Gefre did not join Beck's efforts, review corporate records, take efforts to hold the required Board meetings, or further investigate the self-dealing assertions made by Williams. In December 2002 Gefre and Steffen accepted Beck's resignation as a Petro Alaska officer and removed him as a director.

Petro Alaska retained copies of its pre-2000 records until 2006. An employee destroyed these records in 2006 because she had heard nothing further from Beck regarding corporate records. Beck and Gefre did not further pursue their concerns until Beck contacted a new attorney in May 2006. That attorney briefly reviewed Beck's files and concluded Beck required litigation counsel; Beck and Gefre then retained a new law firm. Through counsel, Gefre and Beck made a corporate records inspection demand to Steffen in February 2007 requesting all documents related to the Property. DWT provided copies of all Property-related records.

## B.    Proceedings

In August 2007 Gefre and Beck, individually and derivatively on behalf of Petro Alaska (collectively the Shareholders), filed suit against Steffen, the LLC, DWT, and DWT partner Jon Dawson.  The complaint alleged:  (1) fiduciary fraud by DWT and Steffen; (2) misappropriation of corporate opportunities by Steffen; (3) participation by DWT in Steffen's tortious conduct; (4) legal malpractice by DWT; and (5) fraudulent conveyance of the Property by DWT and Steffen.   The Shareholders requested imposition of a constructive trust on the Property, an accounting by Steffen, and punitive damages.  The Shareholders also requested that DWT and Steffen be estopped from asserting a statute-of-limitations defense.

The Shareholders did not sue BPK because they were unaware of its 2002 involvement on behalf of Petro Alaska.  BPK initially represented Steffen in the suit. The Shareholders' counsel then came upon a 2002 BPK billing in Petro Alaska's general ledger, and in January 2008 BPK disclosed the nature of its 2002 assistance with Steffen's responses to Beck's letters.  In February 2008 the Shareholders amended their complaint to add Klobucher, Siemers, and BPK as defendants.  The Shareholders also added an intentional spoliation of evidence claim against Steffen and BPK for destruction of records.  Steffen settled with the Shareholders in May 2008 and transferred the Property to Petro Alaska.

Both DWT and BPK moved for summary judgment based on statutes-of-limitations defenses.  The superior court denied DWT's and BPK's motions, but scheduled an evidentiary hearing on the statutes-of-limitations issues. The Shareholders objected to the evidentiary hearing.  In July 2009 the superior court held the evidentiary hearing, and in October 2009 the court dismissed the Shareholders' claims as time-barred and entered final judgment.

The Shareholders appeal the dismissal of all the claims against the attorneys as time-barred. BPK cross-appeals the superior court's refusal to recognize an offer of judgment in awarding fees and costs.

## III. STANDARD OF REVIEW

The date on which a claim accrues is a factual question, which we review for clear error.[2] However, we review de novo the legal standard used to determine accrual dates,[3] and we review de novo questions regarding the applicable statute of limitations, the interpretation of that statute, and whether that statute bars a claim.[4]

We apply our independent judgment to questions of constitutional law,[5] including questions regarding the extent of the right to a trial by jury and the right to equal protection.[6] We "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[7]

---

[2]    *Sengupta v. Wickwire*, 124 P.3d 748, 752 (Alaska 2005) (citing *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 140 (Alaska 2004)).

[3]    *See City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1178-80 (Alaska 1998) (reviewing de novo applicable accrual standards).

[4]    *Weimer v. Cont'l Car & Truck, LLC*, 237 P.3d 610, 613 (Alaska 2010) (citing *Smallwood v. Cent. Peninsula Gen. Hosp.*, 151 P.3d 319, 322-23 (Alaska 2006)).

[5]    *Fraternal Order of Eagles v. City & Borough of Juneau*, 254 P.3d 348, 352 (Alaska 2011) (citing *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 908 (Alaska 2001)).

[6]    *See, e.g.*, *Pomeroy v. Rizzo ex rel. C.R.*, 182 P.3d 1125, 1128 (Alaska 2008) (reviewing by independent judgment constitutional right to trial by jury); *Pub. Emps.' Ret. Sys. v. Gallant*, 153 P.3d 346, 349 (Alaska 2007) ("The equal protection challenge presents a question of law to which this court applies its independent judgment." (citing *Alaska Civil Liberties Union v. State*, 122 P.3d 781, 785 (Alaska 2005))).

[7]    *Fraternal Order of Eagles*, 254 P.3d at 352 (quoting *Alaskans for Efficient*
(continued...)

## IV.	DISCUSSION

### A.	Statutes-Of-Limitations Rulings

#### 1.	Overview

The Shareholders raise several arguments regarding the superior court's statutes-of-limitations rulings. To analyze these arguments, we must address the statutes of limitations applicable to the Shareholders' claims, the proper rule for determining when the claims accrued, and whether the claims' accrual should be delayed. We then address whether equitable estoppel forecloses the statutes-of-limitations defenses.

#### 2.	Applicable statutes of limitations

The Shareholders claim the superior court erred by: (1) refusing to apply AS 09.10.230's ten-year statute of limitations to the conspiracy and fraudulent conveyance claims; and (2) applying the two-year tort statute of limitations to the fiduciary fraud and intentional spoliation claims.

##### a.	Alaska Statute 09.10.230 does not apply to the conspiracy and fraudulent conveyance claims.

Alaska Statute 09.10.230 provides that actions to determine a person's "right or claim to or interest in real property" must be brought within ten years.[8] The superior court ruled AS 09.10.230 applied to the Shareholders' misappropriation of corporate opportunities claim, which directly related to Petro Alaska's interest in the Property, but not to the Shareholders' other claims indirectly related to the Property.

---

[7]	(...continued)
*Gov't, Inc. v. State*, 153 P.3d 296, 298 (Alaska 2007)).

[8]	AS 09.10.230 incorporates the ten-year limitations period provided in AS 09.10.030. *See* AS 09.10.230 (providing action for determination of right or claim to or interest in real property must be "commenced within the limitations provided for actions for the recovery of the possession of real property"); AS 09.10.030 (providing action for recovery of possession of real property must be commenced within ten years).

The Shareholders argue that a civil conspiracy claim for depriving an owner of real property is subject to AS 09.10.230's ten-year limitations period. The Shareholders state the superior court correctly applied AS 09.10.230 to claims against Steffen for his wrongful acquisition and retention of title to the Property. But the Shareholders then contend that because the "nature of the unlawful conduct underlying the conspiracy determines the applicable statute," the conspiracy claims against DWT related to Steffen's acquisition of the Property must also be subject to AS 09.10.230. The Shareholders also argue that a direct fraudulent conveyance claim against DWT (under AS 34.40.010[9]) specifically requires application of AS 09.10.230.

We agree with the superior court's conclusion that the ten-year statute of limitations under AS 09.10.230 does not apply to the Shareholders' civil conspiracy and fraudulent conveyance claims. Because "[AS] 09.10.230 contemplates a dispute over an interest in real property,"[10] we have previously applied it where the nature of the ownership interest was the central issue.[11] We have not applied AS 09.10.230 where the "issue [was] not the ownership interest itself but [rather] improprieties in the bargaining that resulted in the conveyance of that interest."[12] To invoke AS 09.10.230's limitations period, it is not enough for a claim to be merely attendant to an underlying conveyance

---

[9]     AS 34.40.010 provides in relevant part that "a conveyance or assignment . . . of an estate or interest in land . . . or of rents or profits issuing from them . . . made with the intent to hinder, delay, or defraud creditors . . . is void."

[10]     *Bauman v. Day*, 892 P.2d 817, 825 (Alaska 1995).

[11]     *Carter v. Hoblit*, 755 P.2d 1084, 1085-86 (Alaska 1988) (applying AS 09.10.230 to equitable request for one-third interest in property that three individuals had intended to purchase and hold title to jointly, where group member conducting the transaction took deed in his name alone and fraudulently concealed his action). *See also Bauman*, 892 P.2d at 825 (discussing *Carter*).

[12]     *Bauman*, 892 P.2d at 825.

of a property interest — it must directly involve "the determination of a right or claim to or interest in real property."[13] The ten-year statute of limitations under AS 09.10.230 applied to the Shareholders' misappropriation claim against Steffen because the misappropriated opportunity was the lease and ownership of the Property and the relief sought was recovery of the Property. Because the conspiracy claims against DWT and BPK involve only improprieties regarding Steffen's acquisition and retention of the Property, and not the ownership interest itself, AS 09.10.230 is not applicable to these claims.[14]

We similarly conclude that AS 09.10.230 is not applicable to the fraudulent conveyance claim against DWT. Alaska Statute 34.40.010 does not create a special mechanism to recover land, but rather creates a method by which a creditor may reach assets in a third-party's hands by voiding an improper transfer.[15] The direct fraudulent conveyance claim concerns DWT's conduct relating to Steffen's retention of the Property, not Petro Alaska's interest in the Property. Accordingly AS 09.10.230 is inapplicable to the direct fraudulent conveyance claim.

> **b.** **Alaska Statute 09.10.053 applies to all claims against DWT and BPK.**

Contract claims are subject to a three-year statute of limitations under

---

[13]    AS 09.10.230.

[14]    *See Bauman*, 892 P.2d at 825 (finding AS 09.10.230 inapplicable because "[t]he dispute over title and possession arose from the foreclosure sale, while the contract and fraud claims arose from the original sale of the property").

[15]    *See* AS 34.40.010; *see also Gabaig v. Gabaig*, 717 P.2d 835, 838 (Alaska 1986) (stating under AS 34.40.010, "[a] conveyance intended to hinder, delay or defraud creditors or other persons in their lawful suits is void").

AS 09.10.053.[16] We have held previously that actions for a breach of a fiduciary duty arising out of a professional services relationship generally are governed by AS 09.10.053.[17] In contrast, tort claims generally must be brought within two years under AS 09.10.070.[18]

The Shareholders argue AS 09.10.053 should apply to the fiduciary fraud claims against DWT and BPK. But the superior court did apply AS 09.10.053 to these claims. The court initially stated that "[m]ost of [the Shareholders'] causes of action against DWT [and BPK] are subject to" AS 09.10.053, and then listed only the spoliation and fraudulent conveyance claims as subject to AS 09.10.070.

The Shareholders also argue the court incorrectly applied the two-year statute of limitations under AS 09.10.070 to the claims for spoliation by BPK and fraudulent conveyance by DWT. The Shareholders contend the court should have applied AS 09.10.053's three-year statute of limitations to these claims.

Although intentional spoliation of evidence is a tort claim,[19] the spoliation claim in this case arises in connection with the assertion of BPK's breach of fiduciary duty in a legal malpractice claim. Similarly the fraudulent conveyance claim in this case

---

[16] AS 09.10.053 provides that "[u]nless the action is commenced within three years, a person may not bring an action upon a contract or liability, express or implied."

[17] *See Lee Houston & Assocs., Ltd. v. Racine*, 806 P.2d 848, 854 (Alaska 1991) (construing former AS 09.10.050, now codified at AS 09.10.053).

[18] AS 09.10.070 is a residual statute of limitations in that it governs all claims "for personal injury . . . not arising on contract and not specifically provided otherwise." AS 09.10.070(a)(2). *See Austin v. Fulton Ins. Co.*, 444 P.2d 536, 538 (Alaska 1968) (stating "it is clear that the two-year statute of limitations respecting torts is applicable" to negligence claims); *Silverton v. Marler*, 389 P.2d 3, 5 (Alaska 1964) ("A tort action must be commenced within two years . . . ." (citing AS 09.10.070)).

[19] *See Allstate Ins. Co. v. Dooley*, 243 P.3d 197, 200-01 (Alaska 2010).

arises in connection with the assertion of DWT's breach of fiduciary duty in a legal malpractice claim. Because we give preference to the longer limitations statute when two may reasonably apply,[20] AS 09.10.053 provides the appropriate limitations period for these claims. It was error to apply AS 09.10.070 to the Shareholders' spoliation and fraudulent conveyance claims.

### 3. Accrual and timely filing of two claims

The Shareholders argue the superior court made errors in its accrual findings and conclusions. The general rule is that "accrual of a cause of action is established at the time of the injury."[21] Under this rule, we determine whether a claim was timely filed by computing the time period between when the cause of action accrued and when the plaintiff filed a claim. If this time period does not exceed the applicable statute of limitations, then the claim is timely filed.[22]

---

[20] *City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1181 (Alaska 1998) ("If two limitations statutes may reasonably apply, preference is given to the longer limitations period.").

[21] *Cameron v. State*, 822 P.2d 1362, 1365 (Alaska 1991). *See also John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1031 n.14 (Alaska 2002) ("The date on which the statute of limitations begins to run is usually the 'date on which the plaintiff incurs injury.' " (quoting *Russell v. Municipality of Anchorage*, 743 P.2d 372, 375 (Alaska 1987))).

[22] The Shareholders argue the superior court erred by applying the accrual rule, and not an "express trust" method of accrual, which delays accrual until a trustee clearly repudiates an express trust. *See Arneman v. Arneman*, 264 P.2d 256, 262 (Wash. 1953) ("[T]he statute of limitations begins to run on a resulting trust, not when such trust comes into being, but when the trustee repudiates the trust and notice of such repudiation is brought home to the beneficiary."). The Shareholders contend that under this method the limitations period on the breach of fiduciary duty claims could not have begun to run before Steffen's unequivocal 2002 disavowal of holding the Property in trust for Petro Alaska. But the Shareholders never claimed that Steffen held the Property in express

(continued...)

### a.    Spoliation claim

The record destruction underlying the spoliation claim against BPK occurred in August 2005.  As discussed above, we agree with the Shareholders that this claim is subject to AS 09.10.053's three-year statute of limitations.[23]  Because the Shareholders added this claim in February 2008, before the three-year period expired, this claim was timely filed.  We therefore reverse the dismissal of this claim on statute-of-limitations grounds.

### b.    Legal malpractice claims

The Shareholders challenge the court's dismissal of the legal malpractice claims against DWT and BPK.  The superior court ruled that the claims against Steffen for an interest in the Property accrued by mid-1996, indicating the limitations period under AS 09.10.230 expired in mid-2006.  The Shareholders argued at the evidentiary hearing that DWT and BPK committed legal malpractice by not warning Petro Alaska that potential causes of action against Steffen were set to be statutorily barred.  Because the court found the statute of limitations on the AS 09.10.230 claims against Steffen expired in 2006, the Shareholders argue Petro Alaska suffered a new harm at this point and that the claims for legal malpractice based thereon could not have expired until 2009.  In contrast, BPK argues that under the discovery rule the applicable statute of limitations

---

[22]    (...continued)
trust; the Shareholders claimed Steffen held the Property in constructive trust.  *Cf. D.A.W. v. State*, 699 P.2d 340, 342 (Alaska 1985) ("A party may not raise for the first time on appeal an alleged error to which he failed to object to in the [superior] court." (quoting *Chugach Elec. Assoc. v. Lewis*, 453 P.2d 345, 349 (Alaska 1969))).  And even if we were to consider the express trust argument for the first time on appeal, it is unavailing — because the claims are subject to a three-year statute of limitations they would have expired in 2005, two years before suit was brought in 2007.  We therefore decline to consider adopting an express-trust accrual rule.

[23]    *See* Part IV.A.2.b, above.

began running once Gefre and Beck became aware of all the elements of the legal malpractice claims.

The expiration of claims against Steffen is a legal harm distinct from Steffen's misappropriation of the corporate opportunity. Because a claim generally does not accrue until the plaintiff suffers the harm giving rise to it, the legal malpractice claims against DWT and BPK for failing to warn Petro Alaska of the expiration of the limitations period did not accrue until 2006. Contrary to BPK's argument and for the reasons we discuss below, the discovery rule operates only to lengthen — and never to shorten — the limitations period.[24] Given the three-year limitations period under AS 09.10.053, the legal malpractice claims based on the alleged failure to advise Petro Alaska of the expiration of the limitations period against Steffen were timely filed in 2007 and 2008.[25] It therefore was error to dismiss these limited legal malpractice claims.

### 4. Discovery rule and remaining claims

#### a. Doctrinal framework

Although a cause of action generally accrues when the plaintiff incurs an injury, accrual can be delayed under a statutory or common-law discovery rule. For example, in AS 09.10.230 the legislature adopted a statutory discovery rule for fraudulent conveyance actions, delaying accrual of the ten-year statute of limitations until the fraud is discovered. The Shareholders assert, based on the argument that the conspiracy and fraudulent conveyance claims against DWT and BPK arise under AS 09.10.230, that accrual of these claims should be statutorily delayed. But because we

---

[24] *Jarvill v. Porky's Equip., Inc.*, 189 P.3d 335, 339 (Alaska 2008).

[25] Because we conclude these limited legal malpractice claims against DWT and BPK are not time-barred, we do not need to address the Shareholders' argument that a continuous representation rule should have been applied to toll these claims.

conclude the claims are not subject to AS 09.10.230,[26] the superior court correctly ruled this statutory discovery rule is not applicable.

The common-law discovery rule tolls the running of an applicable statute of limitations "[w]here an element of a cause of action is not immediately apparent."[27] It "developed as a means to mitigate the harshness that can result from the [accrual] rule's preclusion of claims where the injury provided insufficient notice of the cause of action to the plaintiff."[28] As we have explained:

> [T]he statute of limitations does not begin to run until the claimant discovers, or reasonably should have discovered, the existence of all elements essential to the cause of action. Thus we have said the relevant inquiry is the date when the claimant reasonably should have known of the facts supporting her cause of action. We look to the date when a reasonable person has enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights.[29]

Accordingly the discovery rule may provide different possible dates on

---

[26]     *See* Part IV.A.2.a, above.

[27]     *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1031 (Alaska 2002) (citing *Pedersen v. Zielski*, 822 P.2d 903, 906-07 (Alaska 1991)).

[28]     *Cameron v. State*, 822 P.2d 1362, 1365 (Alaska 1991) (citing *Hanebuth v. Bell Helicopter Int'l*, 694 P.2d 143, 146 (Alaska 1984)); *see also id.* at 1365 n.5 ("[R]ather than characterize the discovery rule as a mitigating, pseudo-equitable doctrine, it is more appropriate to view it as specifying the meaning of 'accrual' under the statute.").

[29]     *Mine Safety Appliances Co. v. Stiles*, 756 P.2d 288, 291 (Alaska 1988) (internal editing marks and citations omitted).

which a statute of limitations can begin to run.[30] First is the inquiry-notice date, "the date when the plaintiff has information which is sufficient to alert a reasonable person to begin an inquiry to protect his rights."[31] Second is the actual-notice date, "the date when [the] plaintiff reasonably should have discovered the existence of all essential elements of the cause of action."[32]

We have held the inquiry-notice date, rather than the actual-notice date, is generally the date from which the statutory period begins to run.[33] But we have noted this general rule may produce unjust results because inquiry "may be a time-consuming process," which "may not produce knowledge of the elements of a cause of action within the statutory period, or it may produce knowledge of the elements of a cause of action only relatively late in the statutory period."[34]

If an inquiry has not been made, we ask in the abstract whether a reasonable inquiry would have produced knowledge of the cause of action.[35] This focuses on an ideal inquiry with the realization that time for a reasonable investigation is included in

---

[30] *John's Heating*, 46 P.3d at 1031 (citing *Waage v. Cutter Biological Div. of Miles Labs., Inc.*, 926 P.2d 1145, 1148 (Alaska 1996)).

[31] *Id.* (citing *Cameron*, 822 P.2d at 1366).

[32] *Id.* (citing *Cameron*, 822 P.2d at 1366).

[33] *Waage*, 926 P.2d at 1148; *Cameron*, 822 P.2d at 1366.

[34] *Cameron*, 822 P.2d at 1366 ("Either way it is possible that a litigant may be deprived of his right to bring a lawsuit before he has had a reasonable opportunity to do so.").

[35] *Pedersen v. Zielski*, 822 P.2d 903, 908 (Alaska 1991).

the length of the statute of limitations.[36]

We recognize some inquiries will be productive and some will not be.[37] If an unproductive inquiry has been made, the analysis changes and we ask whether the plaintiff's inquiry was reasonable.[38]  If the inquiry was not reasonable, then the cause of action accrues at the inquiry-notice date "unless a reasonable inquiry would not have been productive within the statutory period."[39] But if a reasonable inquiry was made, the limitations period is tolled until the plaintiff either:  (1) "received actual knowledge of" the facts giving rise to the cause of action; or (2) "received new information which would prompt a reasonable person to inquire further."[40]

### b.    Application of common-law discovery rule

The superior court assumed the Shareholders' initial inquiry in 1995, which disclosed Steffen held title to the Property, was reasonable.  Because Gefre and Beck individually only periodically asked Steffen about the status of the title transfer, the court found "the reasonableness [of their inquiry] dissipated over time."  Due to Steffen's repeated promises and failures to transfer title, the court found it should have been apparent to the Shareholders by mid-1996 that Steffen was not going to voluntarily transfer title.

---

[36]    *See Palmer v. Borg-Warner Corp.* (*Palmer I*), 818 P.2d 632, 636 (Alaska 1990) ("Indeed, the length of a limitations period reflects legislative awareness that time is needed to investigate a course of action before filing suit.").

[37]    *Pedersen*, 822 P.2d at 908.

[38]    *Id.*

[39]    *Id.*

[40]    *Cameron v. State*, 822 P.2d 1362, 1367 (Alaska 1991) (quoting *Pedersen*, 822 P.2d at 908).

As to claims against DWT, the superior court found that upon learning Steffen held title to the Property, a reasonable inquiry into "when, how, and why" he held title "would have led directly to DWT and DWT's involvement." The court concluded the Shareholders should have discovered the existence of causes of action against DWT by mid-1996.

As to claims against BPK, the superior court found that based on Gefre and Beck's ongoing obligation to conduct a reasonable inquiry concerning Steffen and DWT, a reasonable investigation would have resulted in discovery of BPK's role in 2002. The court found several Petro Alaska employees knew of BPK's involvement in 2002 and a "simple computer search of Petro Alaska's General Ledger would have resulted in the discovery of BPK and its detailed billing for the 2002 work."

The Shareholders argue the superior court erred in finding they did not engage in a reasonable inquiry. The Shareholders assert they engaged in a reasonable but unsuccessful inquiry, and the causes of action should have accrued on the actual-notice date.

When either or both Gefre and Beck were on inquiry notice is a question of fact that "depends upon all of the surrounding circumstances"[41] and is reviewed for clear error.[42] Both Gefre and Beck knew the Property's acquisition was an important corporate opportunity, and they knew by 1995 that the Property was in Steffen's name. They also knew that Steffen had lied and therefore were aware of their injury. Upon being placed on inquiry notice in 1995, Gefre and Beck were charged with "an affirmative duty to investigate *all* potential causes of action before the statute of

---

[41]     *Preblich v. Zorea*, 996 P.2d 730, 736 (Alaska 2000) (quoting *Breck v. Moore*, 910 P.2d 599, 604 (Alaska 1996)).

[42]     *Sengupta v. Wickwire*, 124 P.3d 748, 752 (Alaska 2005).

limitations expire[d],"[43] not merely those directly related to Steffen's acquisition of the Property.[44] Their inquiry also must have been prompt and diligent.[45] The superior court found that Gefre and Beck's initial inquiry requesting that Steffen transfer the Property's title to Petro Alaska was reasonable, but that a reasonable and diligent inquiry would have required further action when it became clear in 1996 that Steffen would not voluntarily transfer title. The superior court also found that a reasonable and diligent inquiry would have disclosed to Gefre and Beck the existence of a cause of action against DWT and BPK. The Shareholders argue that their inquiry was reasonable but unsuccessful and that, in any event, Steffen's oft-repeated assurances that he held the Property in trust for the corporation equitably estopped Steffen, and the corporation's attorneys, from relying on the statute of limitations.

We do not need to resolve this conflict because even if the superior court erred in concluding the accrual date for some of the Shareholders' claims was in mid-1996, the accrual date could not possibly have been later than the end of 2002, when Steffen unequivocally reneged on his position that he held the Property in trust for the corporation. But the Shareholders did not bring their lawsuit until 2007. Their inquiry

---

**43**    *Palmer v. Borg-Warner Corp.* (*Palmer I*), 818 P.2d 632, 634 (Alaska 1990) (emphasis in original) (citing *Mine Safety Appliances Co. v. Stiles*, 756 P.2d 288, 292 (Alaska 1988)).

**44**    Gefre and Beck were directors with corporate fiduciary duties to act "with the care, including reasonable inquiry, that an ordinarily prudent person in a like position would use under similar circumstances." AS 10.06.450(b). This included a duty to know Petro Alaska's business dealings and activities.

**45**    *See id*. at 634-35 n.4 ("[W]e do not insist that a claimant actually know the precise cause of action at the time of the injury, rather we conclude that a claimant must begin an inquiry as to the cause of injury promptly and diligently once it is apparent that an injury has occurred due to the possible negligence of another.").

was therefore unreasonable after 2002. The Shareholders did not satisfy the three-year statute of limitations for their legal-malpractice-based claims.

The Shareholders nonetheless argue that the accrual of the causes of action should have been delayed because of their relative lack of sophistication. A party's relative sophistication is considered in a court's accrual findings,[46] but the party does not have to understand the legal explanation for or significance of an injury before having knowledge sufficient for a cause of action to accrue.[47] By 2002 Gefre and Beck knew the Property's acquisition represented an important corporate opportunity, the Property was in Steffen's name, Steffen had not voluntarily transferred title, and he had withdrawn his statement that he was holding the property in trust for the corporation. Because Gefre and Beck knew or should have known that legal action needed to be taken to protect Petro Alaska's rights, their lack of sophistication does not excuse their unreasonable inquiry after 2002.[48]

### 5. Equitable estoppel

A defendant may in some situations be equitably estopped from pleading a statute-of-limitations defense.[49] Equitable estoppel requires the plaintiff to show: "(1) fraudulent conduct, which may take the form of either an affirmative

---

[46] *Sengupta*, 124 P.3d at 753 (quoting *Preblich v. Zorea*, 996 P.2d 730, 736 (Alaska 2000)).

[47] *See Mine Safety*, 756 P.2d at 291 ("A plaintiff does not have to understand the technical or scientific explanation for a defect before having knowledge sufficient to start the statute of limitations running." (citing *Sharrow v. Archer*, 658 P.2d 1331, 1334-35 (Alaska 1983))).

[48] *Id.* ("We look to the date when a reasonable person has enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights." (citing *Sharrow*, 658 P.2d at 1334)).

[49] *See Williams v. Williams*, 129 P.3d 428, 432 (Alaska 2006).

misrepresentation or a failure to disclose facts where there is a duty to do so; (2) justifiable reliance; and (3) damage."[50] It cannot be invoked "unless [the person has] exercised due diligence in attempting to uncover the concealed facts."[51] In other words, "a party should be charged with knowledge of the fraudulent misrepresentation or concealment only when it would be *utterly unreasonable* for the party not to be aware of the deception."[52]

The superior court found that DWT's and BPK's identities were known by Petro Alaska's employees and revealed within its general ledger. The court also found Gefre and Beck both were aware that Petro Alaska had retained attorneys for some matters. In addressing the Shareholders' equitable estoppel arguments, the superior court noted Gefre and Beck had an affirmative duty by 1995 to investigate all claims related to the Property. The court stated that a reasonable investigation would have focused on how Steffen acquired the Property and who represented Petro Alaska during that time "to find out what they knew about how this very important corporate opportunity had not been realized by [Petro Alaska]." The superior court stated that "[s]uch a reasonable initial investigation would have led directly to DWT." The court also looked at what Gefre and Beck as "ordinarily prudent person[s] in similar circumstances" should have done and discovered "in view of their own fiduciary duties and obligations under AS 10.06.450."[53] The superior court concluded that it would have been utterly

---

[50] *Id.* (citing *Waage v. Cutter Biological Div. of Miles Labs., Inc.*, 926 P.2d 1145, 1149 n.7 (Alaska 1996)).

[51] *Id.* (quoting *Waage*, 926 P.2d at 1151).

[52] *Waage*, 926 P.2d at 1149 (emphasis added) (quoting *Palmer v. Borg-Warner Corp.* (*Palmer II*), 838 P.2d 1243, 1251 (Alaska 1992)).

[53] AS 10.06.450(b) provides that "[a] director shall perform [his] duties . . .
(continued...)

unreasonable for Gefre and Beck not to be aware of DWT's and BPK's alleged deception and concealment by 1996 and 2002, respectively.

The Shareholders argue the superior court's finding that their actions were utterly unreasonable is clearly erroneous, and request that we apply equitable estoppel to extend the limitations period of AS 09.10.053. The Shareholders argue DWT and BPK effectively concealed their involvement in the Property issues, despite an ongoing fiduciary duty to disclose. The Shareholders also claim the superior court's application of AS 10.06.450(b) violates the Alaska Constitution.[54] Specifically the Shareholders argue the superior court's implicit ruling that AS 10.06.450(b) displaced the "utterly unreasonable" standard regarding accrual of the relevant statute of limitations is an equal protection violation.

Again we do not need to resolve whether the Shareholders' investigation during the 1996-2002 period was sufficient. Once Steffen renounced his earlier position that he held the Property in trust for the corporation, he was not equitably estopped from asserting the statute-of-limitations defense.[55] Because at least starting in late 2002 the Shareholders failed to "exercise[] due diligence in attempting to uncover the concealed facts" regarding the Property and because it would not be utterly unreasonable for them

---

[53] (...continued)
in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care, including reasonable inquiry, that an ordinarily prudent person in a like position would use under similar circumstances."

[54] The Shareholders expressly limit the constitutional challenge to the superior court's application of AS 10.06.450(b). The Shareholders do not argue AS 10.06.450 is facially unconstitutional.

[55] *Gudenau & Co. v. Sweeny Ins., Inc.*, 736 P.2d 763, 769 (Alaska 1987) ("Plaintiff must also show that it resorted to legal action within a reasonable period after the circumstances ceased to justify delay.").

to be aware of DWT's and BPK's identity and involvement thereafter, the Shareholders cannot invoke equitable estoppel now.[56]

We reject the Shareholders' equal protection violation argument. Alaska Statute 10.06.450(b) required Gefre and Beck to perform their duties as directors "with the care, including reasonable inquiry, that an ordinarily prudent person in a like position would use under similar circumstances." Gefre and Beck's status as directors and AS 10.06.450(b)'s "reasonable inquiry" standard assist in evaluating Gefre and Beck's investigatory diligence. It does not hold them to a different standard — it merely holds them to a reasonable standard based "upon all of the surrounding circumstances."[57] Accordingly the superior court did not commit an equal protection violation.

## B. Validity Of The Statutes-Of-Limitations Evidentiary Hearing

The Shareholders argue that use of evidentiary hearings to resolve factual questions underlying statutes-of-limitations issues is a violation of the constitutional right to a jury trial. BPK cites several of our prior decisions as evidence that we "recognize[] the superior court's ability to act as fact-finder to resolve statute of limitations issues at an evidentiary hearing." DWT adds that the Shareholders have failed to establish "compelling reasons" for entirely abandoning pretrial evidentiary hearings.[58]

---

[56] *Williams*, 129 P.3d at 432 (quoting *Waage*, 926 P.2d at 1151).

[57] *Preblich v. Zorea*, 996 P.2d 730, 736 (Alaska 2000) (quoting *Breck v. Moore*, 910 P.2d 599, 604 (Alaska 1996)).

[58] See *McCrary v. Ivanof Bay Vill.*, 265 P.3d 337, 340-41 (Alaska 2011):

Our precedent is not lightly set aside. We have repeatedly held that a party raising a claim controlled by an existing decision bears a heavy threshold burden of showing compelling reasons for reconsidering the prior ruling. We will overrule a prior decision only when clearly convinced

(continued...)

### 1. Evidentiary hearings generally

"The purpose of statutes of limitations is to eliminate the injustice which may result from the litigation of stale claims."[59]  To facilitate this purpose we have recognized the propriety of evidentiary hearings to resolve factual issues regarding statutes of limitations.[60]  The Shareholders are correct that article I, section 16 of the Alaska Constitution provides that "[i]n civil cases where the amount in controversy exceeds [$250], the right of trial by a jury of twelve is preserved to the same extent as it existed at common law."  But "the task of interpreting and applying a statute of limitations traditionally falls within the province of the courts."[61]  We again approve the

---

[58]    (...continued)
>   that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent.

(quoting *Guerrero ex rel. Guerrero v. Alaska Hous. Fin. Corp.*, 123 P.3d 966, 982 n.104 (Alaska 2005)) (footnote and internal quotation marks omitted).

[59]    *Pedersen v. Zielski*, 822 P.2d 903, 907 (Alaska 1991) (citing *Johnson v. City of Fairbanks*, 583 P.2d 181, 187 (Alaska 1978)).

[60]    *Id.* at 907 n.4 ("Holding an evidentiary hearing well in advance of trial to resolve fact questions goes part way toward meeting the early resolution goals of statutes of limitations.  We recommend such a hearing in this case.").

[61]    *Cikan v. ARCO Alaska, Inc.*, 125 P.3d 335, 339 (Alaska 2005); *see also Ellicott v. Nichols*, 7 Gill 85, 96 (Md. 1848) (stating "it is the province of the court authoritatively to interpret" the facts and determine whether they "take the plaintiff's claim out of the bar of the statute of limitations")*; Sundell v. Town of New London*, 409 A.2d 1315, 1320 (N.H. 1979) ("The rule in this State is that a statute of limitations is a matter of procedure, the interpretation and application of which is traditionally within the province of the court . . . ." (citation, quotation marks, and internal editing omitted)); *Lopez v. Swyer*, 300 A.2d 563, 567 (N.J. 1973) ("[T]he question as to the application of the statute of limitations is ordinarily a legal matter and as such is traditionally within the
(continued...)

use of evidentiary hearings to determine when a cause of action accrued.[62]  Specifically we affirm that when "a factual dispute precludes entry of summary judgment [on a statute-of-limitations defense] the dispute must ordinarily be resolved by the [superior] court at a preliminary evidentiary hearing in advance of trial."[63]

We acknowledge that in certain circumstances the superior court may improperly reach the merits of an underlying claim within the evidentiary hearing.  For example, in *Williams v. Williams* the superior court held an evidentiary hearing and found it necessary to reach the underlying question of fraud to resolve a statutory tolling question.[64]  Although the court also reached alternative conclusions supporting its result, we recognized that "addressing the substantive merits of a case in . . . a preliminary evidentiary hearing can create considerable tension with the . . . right to a jury trial."[65]  But to the extent the superior court does not address the substantive merits of a case, the use of evidentiary hearings to decide statutes-of-limitations issues is constitutional.

## 2.      Evidentiary hearing in this case

The Shareholders argue that the superior court made several improper findings as a result of the evidentiary hearing.  Specifically the Shareholders challenge the court's determination that: (1) the reasonableness of their reliance on Steffen's

---

[61]      (...continued) province of the court.").

[62]      *See, e.g.*, *Egner v. Talbot's, Inc.*, 214 P.3d 272, 278 (Alaska 2009); *Domke v. Alyeska Pipeline Serv. Co.*, 137 P.3d 295, 303 n.19 (Alaska 2006).

[63]      *Cikan*, 125 P.3d at 339 (citing *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1033 n.28 (Alaska 2002)).

[64]      129 P.3d 428, 431 (Alaska 2006).

[65]      *Id.* at 431.

representations "dissipated over time"; and (2) "it should have been apparent to [them] by mid 1996 that [Steffen] was not going to voluntarily transfer title." The Shareholders argue for an "inviolate right to jury trial on these issues."

We conclude the superior court properly decided these issues. The court had before it evidence establishing that the Shareholders had knowledge the Property's acquisition was an important corporate opportunity, Steffen purchased the Property in his name, and Steffen repeatedly failed to transfer title to Petro Alaska. The court acted well within its authority to make factual findings as to when the Shareholders had inquiry notice of the potential causes of action arising out of Steffen's misappropriation. In making these findings, the court did not address the merits of any underlying claims within the evidentiary hearing — the court merely addressed when the Shareholders had notice of these potential claims and not whether there was any merit to these claims.

## C. Attorney-Client Privilege Issues

### 1. Gefre, Beck, and Keene

The Shareholders argue the superior court erred in ruling they waived their attorney-client privilege with Keene by asserting the discovery rule and equitable estoppel in the statutes-of-limitations disputes. The Shareholders argue the court applied the incorrect standard for finding a waiver of the attorney-client privilege. The Shareholders suggest the court should have adopted the waiver test established in *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.*,[66] instead of the test established in *Hearn v. Rhay*.[67]

Under the *Rhone* test, the attorney-client privilege is waived only if the

---

[66]    32 F.3d 851, 863 (3d Cir. 1994).

[67]    68 F.R.D. 574, 581 (E.D. Wash. 1975).

litigant directly puts the attorney's advice at issue in the litigation.**68**  In other words, the

privilege is waived once a party seeks to avoid or limit liability by showing reliance on

counsel's advice.  This test rejects relevance as the standard for waiver because it

undermines the exchange of confidential and candid communications between attorney

and client.**69**  In contrast, under the *Hearn* test the attorney-client privilege is waived if:

> (1) assertion of the privilege was a result of some affirmative
> act, such as filing suit, by the asserting party; (2) through this
> affirmative act, the asserting party put the protected
> information at issue by making it relevant to the case; and (3)
> application of the privilege would have denied the opposing
> party access to information vital to his defense.[70]

The superior court adopted the *Hearn* test based on our focus on fairness,

finding an implied waiver of the attorney-client privilege.**71**  The court then concluded

that the Shareholders had "impliedly waived the attorney client privilege with respect to

their communications with [Keene] that relate or pertain to DWT."  Accordingly the

court stated DWT could pursue discovery from Gefre, Beck, and Keene concerning what

they knew about Steffen and DWT.

We have previously noted a client may impliedly waive the attorney-client

privilege by putting discussions with counsel at issue.**72**  We stated the "purpose of the

---

**68**     *Rhone-Poulenc Rorer*, 32 F.3d at 863.

**69**     *Id.* at 864.

**70**     *Hearn*, 68 F.R.D. at 581.

**71**     *See Lewis v. State*, 565 P.2d 846, 850 n.4 (Alaska 1977) (finding fairness
dictated attorney-client privilege was waived when client filed motion that put into "issue
what advice he did or did not receive from [his attorney]").

**72**     *Id.*

rule implying waiver in [such a] situation is essentially fairness to the opposing party."[73] In addition, "we emphasize[d] that it is not the mere filing of [a] motion, but the actual placing in issue of confidences covered by the privilege, that waives the attorney-client privilege."[74] Because we continue to believe fairness to the opposing party should be included in the implied waiver analysis, we adopt the *Hearn* test.[75]

Applying the *Hearn* test, we conclude the superior court did not err in finding the Shareholders placed their communications with Keene at issue by raising the discovery rule and estoppel in response to DWT's statutes-of-limitations defenses. The communications are material to the defenses because the Shareholders claimed they had no knowledge, either direct or constructive, of DWT's identity or role with regard to Steffen's conduct. The Shareholders cannot be permitted to thrust their lack of knowledge into the litigation while simultaneously retaining the attorney-client privilege to frustrate proof of knowledge that negates the very foundation necessary to their positions. The superior court correctly found fairness dictated that DWT be permitted to discover from Gefre, Beck, and Keene what they knew about Steffen and DWT.[76]

### 2. Petro Alaska and DWT

The Shareholders also challenge the superior court's denial of a motion to

---

[73] *Id.*

[74] *Id.*

[75] *See also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 80 (1998) reporter's note cmt. b ("The preferred approach is to require that the client either permit a fair presentation of the issues raised by the client or protect the right to keep privileged communications secret by not raising at all an issue whose fair exposition requires examining the communications.").

[76] *See League v. Vanice*, 374 N.W.2d 849, 855-56 (Neb. 1985) (finding implied waiver when plaintiff justified noncompliance with statute of limitations by alleging that delay was caused solely by defendant's concealment of facts).

waive DWT's attorney-client privilege while DWT simultaneously represented Petro Alaska and Steffen individually. Specifically the Shareholders request all communications between DWT and any inside or outside counsel relating to matters involved in this litigation.

DWT voluntarily produced all pre-litigation documents created internally, thereby rendering Petro Alaska's claim moot as to internal communications. The Shareholders' claim regarding communications between DWT and outside counsel is waived for a failure to adequately brief it — a single conclusory sentence requesting DWT's communications with outside counsel without citation of any authority providing for such a remedy is not adequate to put the issue before this court.[77]

## D. Attorney's Fees As Special Damages

The Shareholders argue the superior court incorrectly ruled that a plaintiff cannot recover attorney's fees incurred in bringing suit as special damages in that suit. Specifically the Shareholders argue DWT and BPK committed legal malpractice and fiduciary fraud, causing Gefre and Beck to incur attorney's fees in this litigation.

The general rule is "that attorney's fees for work in the case under review are not recoverable as damages."[78] A prevailing party's attorney's fees are generally recoverable only as an attorney's fee award under Alaska Civil Rule 82. However it is

---

[77] *A.H. v. W.P.*, 896 P.2d 240, 243-44 (Alaska 1995) (finding issue waived for inadequate briefing because "superficial briefing and the lack of citations to any authority constitutes abandonment of the point on appeal"); *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not considered on appeal.").

[78] *Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.*, 81 P.3d 989, 1008 (Alaska 2003), *cited in ASRC Energy Servs. Power & Commc'ns, LLC v. Golden Valley Elec. Ass'n, Inc.*, 267 P.3d 1151, 1165 (Alaska 2011); *see also* RESTATEMENT (SECOND) OF TORTS § 914(1) (1979) ("The damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of the litigation.").

also generally recognized that "when the defendant has breached a specific duty to protect the plaintiff from litigation expenses, the defendant is necessarily liable for those expenses, including attorney fees."[79] "When recovery of a fee award is permitted . . . the fee award is *damages*, not *costs*."[80] For example, "where the negligence of a malpracticing lawyer requires the client to protect her interests by litigating with others; the lawyer is liable for the litigation expenses as consequential damages."[81]

As applicable here, we agree "that a legal malpractice plaintiff may recover as actual damages the attorney fees incurred as a result of the defendant's malpractice, so long as the plaintiff can demonstrate she would not have incurred the fees in the absence of the defendant's negligence."[82] Therefore if the Shareholders are successful on the spoliation and legal malpractice claims on remand, then the fact-finder must determine what, if any, of their attorney's fees incurred against Steffen would not have been incurred in the absence of DWT's and BPK's specific wrongdoing, and, thus, are

---

[79]     1 DAN B. DOBBS, LAW OF REMEDIES: DAMAGES-EQUITY-RESTITUTION § 3.10(3), at 401 (2d ed. 1993) (This "reflect[s] a willingness to award attorney fees to the plaintiff when the defendant should have protected the plaintiff from litigation or litigation costs."); *see also* RESTATEMENT (SECOND) OF TORTS § 914(2) ("One who through the tort of another has been required to act in the protection of his interests by bringing . . . an action against a third person is entitled to recover reasonable compensation for . . . attorney fees . . . thereby suffered or incurred in the earlier action.").

[80]     DOBBS at 402 (emphasis in original).

[81]     *Id*. at 407-08; *see also Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 867 N.E.2d 385, 388 (N.Y. 2007) ("A plaintiff's damages [in a legal malpractice case] may include 'litigation expenses incurred in an attempt to avoid, minimize, or reduce the damage caused by the attorney's wrongful conduct.' " (quoting *DePinto v. Rosenthal & Curry*, 655 N.Y.S.2d 102, 102 (N.Y. App. Div. 1997))).

[82]     *Nettleton v. Stogsdill*, 899 N.E.2d 1252, 1261 (Ill. App. 2008).

recoverable as damages. But the Shareholders may not recover as special damages attorney's fees incurred in asserting claims against DWT and BPK.

### E. Other Issues

The Shareholders argue the superior court erred in denying a motion prohibiting DWT from arguing comparative fault as to the fiduciary fraud claim. The Shareholders also argue the court erred in granting DWT's motion for an order that DWT and BPK should not be jointly and severally liable for the conspiracy and aiding and abetting causes of action. Because the underlying claims are time-barred, we decline to address these issues.

The Shareholders also contend the superior court incorrectly dismissed the claim that DWT must disgorge fees because of alleged ethical violations. The court dismissed the claim because it found the Shareholders had adequate and complete legal remedies available. Because the Shareholders provide merely a single conclusory sentence without further discussion or citation of any authority, we find the issue waived for a failure to adequately brief.[83]

On cross-appeal, BPK argues the superior court erred in refusing to recognize its October 2008 offer of judgment under Alaska Civil Rule 68. Because we are remanding the spoliation claim against BPK to the superior court and BPK's judgment against the Shareholders must be vacated, we decline to address the Rule 68 issue.

## V. CONCLUSION

For the reasons stated above, we VACATE DWT's and BPK's judgments and REMAND for further proceedings consistent with the opinion.

---

[83] *See* note 77, above.